## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| KARIN GERTRUDE HARRIS, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | 1:06-cv-00732-RWR |
| ) | |
| SOCIALIST PEOPLE'S LIBYAN ARAB ) | |
| JAMAHIRIYA, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |
| _____ ) | |

## <u>DECLARATION OF NICOLE E. ERB</u>

I, Nicole E. Erb, declare as follows:

1.      I am a partner of the firm White & Case LLP ("White & Case") and counsel for the Libyan State Defendants.  I submit this declaration pursuant to Rule 56(f) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1746 in support of the Libyan State Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment as to Liability.

2.      The Libyan State Defendants require discovery regarding all materials submitted by Plaintiffs, as well as discovery independent of these materials.  This declaration should not be construed as limiting the scope of discovery that the Libyan State Defendants may be entitled to request should this case proceed to jurisdictional and/or merits discovery.

3.      Plaintiffs place heavy reliance on the decision issued by the Berlin District Court in *Yasser Mohamed Chraidi, et al.*, Reference No.: (539) 1 Js2/92 KLs (8/97), November 13, 2001 (Pls.' Ex. 1(a)) (the "Berlin Decision").  Yet, Plaintiffs include only brief excerpts of this 380-page decision with their submission.  The Libyan State Defendants must be afforded an opportunity to obtain a complete copy of the Berlin Decision.  As stated in the Affidavit of Nils

Clemm dated April 14, 2008, the Libyan State Defendants have begun the process under German law to obtain complete copies of the full criminal case file in the *Chraidi* matter.

4.      The Berlin criminal proceedings spanned almost five years, from January 30, 1997 — the date that five accused perpetrators were indicted — to November 13, 2001 — the date that the Berlin District Court issued convictions.  *See Chraidi v. Germany*, No. 65655/01 (Eur. Ct. H.R. Jan. 26, 2007) (available from the Austrian Human Rights Institute at: http://www.menschenrechte.ac.at/orig/06_5/Chraidi.pdf) at ¶¶ 12-16, attached as Exhibit 1.  The Berlin District Court "held 281 hearings with an average of two hearings per week and [heard testimony] from 169 witnesses." *Id*. at ¶ 17.

5.      Given the substantial and complex nature of the Berlin criminal proceedings, the Libyan State Defendants are entitled to discover all materials in connection with the Berlin criminal proceedings that could contradict Plaintiffs' characterization of the Berlin Decision based on limited excerpts as purported evidence of the Libyan State Defendants' civil liability in this case.  Such discovery would include all witness statements, trial exhibits, transcripts of proceedings, and decisions of the Berlin District Court and the Federal Supreme Court upon review.

6.      Plaintiffs rely on the September 10, 1996 and October 16, 1996 confessions of Musbah Abulgasem Eter (Pls.' Ex. 1(b)), an individual convicted in Germany of participation in the La Belle bombing.  The Libyan State Defendants are entitled to depose Eter to discover the circumstances under which those confessions were obtained and the basis for the statements made therein.  Moreover, there are serious questions as to the reliability of the Eter confessions, particularly in view of the information contained in the German appellate decision rendered in the *Chraidi* criminal case revealing that the Berlin District Court's decision deemed at least one

of these confessions inadmissible at trial.  *See* Decision of the Federal Supreme Court dated June 24, 2004 ("Federal Decision") at 4-5, attached as Exhibit 2.

7.    Furthermore, the Libyan State Defendants are entitled to discovery to explore Eter's potentially self-serving motivation for confessing.  The Berlin District Court noted that Eter's statements, which placed responsibility for the planning of La Belle on his superiors, must be viewed in light of Eter's potential interest in "easing his own case to incriminate [Al] Keshlaf and [Abdallah] Elamin."  Pls.' Ex. 1(a) at 241.  Eter, himself, appeared to condition his testimony on being afforded protection: "Naturally I am prepared to repeat these statements in front of a German court . . . [b]ut I would like to be protected."  Pls.' Ex. 1(b) at 40.  The Federal Supreme Court noted that in the opinion of the Berlin District Court: "Defendant E[ter] was deceived insofar as he was given the wrong impression that, in the event of a guilty verdict, confessionary information was very likely to mitigate his sentence irrespective of the significance of his contribution to the crime conceded by him."  Federal Decision at 5.

8.    Plaintiffs also appear to place heavy reliance on Eter's statements for their allegations about the role of the Libyan intelligence service and its alleged involvement in the La Belle incident.  It is therefore essential that the Libyan State Defendants be able to obtain to discovery in regards to the contradictions between Eter's statements and other testimony and evidence with respect to the Libyan secret service.  In particular, Eter claimed that an operative of the Libyan secret service was embedded in the Libyan Embassy in Berlin; however, Keshlaf stated that no such "secret resident" was present at the Libyan Embassy.  Pls.' Ex. 1(a) at 239. Another witness, Said Rasheed, apparently also testified that "it would have been a scandal had there been a secret service agent resident at [the Libyan Embassy]."  *Id*.  Both Elamin and

Keshlaf denied membership in the Libyan secret service. *Id.* Discovery regarding Elamin, Keshlaf and Rasheed is necessary as their testimony directly conflicts with that of Eter.

9.      Furthermore, the Berlin District Court rejected aspects of Keshlaf's and Elamin's testimony over that of Eter and another accused, Ali Chanaa, and the statements of the "MfS witnesses." The Libyan State Defendants are entitled to review these statements and any accompanying testimony, and even seek depositions. It is also noteworthy that Chanaa allegedly received some payment for his involvement in La Belle from Elamin and those payments stopped "when Elamin was removed from his office in the [Libyan Embassy]." Pls.' Ex. 1(b) at 34. The propensity for bias in Chanaa's statements is evident and the Libyan State Defendants are entitled to discovery in this respect.

10.     Plaintiffs also rely on an alleged cable communication from the German Ambassador to the United States dated March 31, 2001 (Pls.' Ex. 1(d)). The Libyan State Defendants should be entitled to discover the facts and circumstances surrounding the alleged intercepted Libyan cable communications dated March 25, 1986 – April 5, 1986 (Pls.' Ex. 1(e)) to determine their authenticity and reliability, particularly given that Plaintiffs claim these communications demonstrate Libya's liability in this action.

11.     Regarding the statements as to Colonel Muammar Al-Qadhafi's alleged admission of responsibility for La Belle, publicly available documents report that both the Libyan and German governments have denied the accuracy of the communication's contents, each stating that Al-Qadhafi never made any such admissions to Steiner. *See, e.g.*, *Germany, Libya Deny Gadhafi Admitted Ties To Terrorist Incidents*, Middle E. News Online, May 15, 2001, *available at* 2001 WLNR 10138364; *Germany Denies Gadhafi Admitted To Bombings*, United Press Int'l, May 16, 2001, *available at* http://www.highbeam.com/doc/1P1-

44305757.html.   German Foreign Minister Joschka Fischer, testifying before the German parliament's foreign affairs committee on May 30, 2001, stated that "[I]t is completely clear that there has been absolutely no explanation on the side of Gadhafi which is legally relevant or relevant to evidence," and that it is the German "government's position that Gadhafi had made no such admission."   *Memo Leak Embarrasses Germany*, May 31, 2001, http://archives.cnn.com/2001/WORLD/europe/05/31/germany.memo/index.html.    Uwe-Karsten Heye, spokesperson for then-Chancellor Gerhard Schroeder, issued a statement on May 15, 2001 affirming Al-Qadhafi had met with Steiner, but that "individual cases from the past were not discussed" and that Al-Qadhafi had "distanced himself from terrorism in this talk.  It was about issues of fighting international terrorism."  John Schmid, *Gadhafi Is Said to Have 'Sworn Off' Practice: Libya Reportedly Admits A Terrorist Role in 1980s*, Int'l Hrld. Trib., May 16, 2001, *available at* http://www.iht.com/articles/2001/05/16/libya_ed3__0.php.  Steiner himself "denied that Colonel Gadafi had confessed to terrorism," and stated that he had "been misrepresented." *See* Roger Boyes, *Berlin Feud Over Gaddafi Link to Blast*, The Times, May 19, 2001, at 18.  On May 15, 2001, a spokesperson for the Libyan government described the communication "as unfounded and a clear fabrication" designed to undermine Libya's foreign policy objectives.  *See Libya: Official Criticizes German Report on 1986 Berlin Disco Bombing*, BBC Int'l Rep., May 15, 2001, translating a report by Libyan news agency Jana.  Copies of all the foregoing media materials are attached as Exhibit 3.

12.    Plaintiffs further rely on alleged intercepted cable communications to support their claims.  Pls.' Ex. 1(e).  Plaintiffs attach a letter from the Federal Intelligence Service to the Prosecution of the Superior Court of Justice Berlin purporting to repeat what the alleged cable communications say — notwithstanding the fact that the alleged communications were

purportedly written in Arabic and the letter repeats their alleged contents in German. It is unclear how the author of the letter came to obtain or review the alleged telex communications. *See* Pls.' Ex. 1(e) at 1 ("The Federal Intelligence Service (BND) *came to the knowledge of* the following Telex communication . . . .) (emphasis added). Moreover, the letter is dated October 9, 1996, more than ten years after the alleged cable communications were intercepted. That the alleged communications have now been twice translated (first from Arabic to German, and now from German to English) raises questions as to the reliability of Plaintiffs' proffer. Accordingly, discovery as to all aspects of the facts and circumstances surrounding these communications is required, including the whereabouts and untranslated text of the original, and, in particular, discovery regarding the chain of custody is essential.

13. Moreover, the fact that Plaintiffs' own evidence calls into question the authenticity and reliability of the alleged communications further necessitates discovery. In particular, the September 10, 1996 confession of Eter explains that Eter was present at the Libyan Embassy in Berlin "every day in the days following the attack" and:

> There was no more talk about the attack and I can also say with certainty that no wire was received from Libya on this matter. At the time, in order to check this, I asked Ali KESHLAF, who was the sole person in the [Embassy] responsible for telecommunications and encryption. He confirmed expressly that there was no 'congratulation'-wire [sic] from Libya as was wrongly alleged by the press.

Pls.' Ex. 1(b).

14. Plaintiffs additionally purport to support their allegations with an unauthenticated arrest warrant for Said Rashid, Elamin Elamin, Ali Keshlaf, Souad Chraidi, and Musbah Al Abani. Pls.' Ex. 1(f). Discovery is essential to authenticate the arrest warrants. For example, the date of the arrest warrant is not apparent on the face of the document. The Libyan State Defendants are also entitled to discovery with respect to the facts underlying the warrants. The

arrest warrant states that "[t]he accused are strongly suspected of committing this crime based on the credible confession by the also accused Eter and also by many additional items of supporting evidence." Pls.' Ex. 1(f) at 4. In issuing the arrest warrant, the Tiergarten court credited Eter's confession — a confession that the Berlin District Court and Federal Supreme Court found inadmissible. As stated above, the reliability of Eter's confessions is in question. Moreover, the Libyan State Defendants require discovery to obtain and analyze the "many additional items of supporting evidence" that formed the basis for the arrest warrant.

15. Discovery regarding Plaintiffs' expert affiants, David Long, Ph.D. and Ambassador Robert Oakley, is also necessary to build an adequate defense to Plaintiffs' claim. The Libyan State Defendants should be afforded the opportunity to cross-examine these individuals. Dr. Long's and Ambassador Oakley's affidavits raise factual issues that the Libyan State Defendants can only address after conducting discovery. In particular, the Libyan State Defendants are entitled to fully examine Dr. Long's and Ambassador Oakley's backgrounds, previous expert witness experience, relationship with the Plaintiffs, form of compensation, and bases for their opinions. The Libyan State Defendants must also be afforded the opportunity to examine the sources upon which these experts rely, to test the reliability of the sources, and to determine whether the experts draw only reasonable inferences. This is particularly important where the authenticity and admissibility of the unidentified wire interceptions on which the experts rely is disputed. More importantly, neither the Long nor the Oakley affidavit specifically identifies or attaches the alleged wire intercepts referred to in their affidavits. Nonetheless, both have submitted broad statements regarding the intercepts. *See* Affidavit of David Long, Ph.D at ¶ 8 ("I personally viewed these communication intercepts and they left no doubt in my mind that Libya ordered its agents in Germany to commit the terrorist attack commonly referred to as the

LaBelle Discotheque bombing."); Affidavit of Ambassador Oakley at ¶ 12 ("I testify that these communication intercepts left no doubt that Libya ordered its agents in Germany to commit the terrorist attack commonly referred to as the LaBelle Discotheque bombing.").

16.     Plaintiffs also introduce nearly 12-year old statements of Major General John H. Mitchell and Lieutenant General Thomas N. Griffin, Jr.  These statements fail to provide, much less identify, or even describe, any of the written documents upon which the statements rely. Moreover, Mitchell and Griffin indicate that they relied, at least in part, on a "source of undetermined reliability." Pls.' Ex. 10, Mitchell Statement at ¶ 6; Pls.' Ex. 11, Griffin Statement at ¶ 6.  The fact that both statements are nearly identical also raises credibility questions that the Libyan State Defendants should be entitled to explore through discovery.

17.     Finally, Plaintiffs append various unverified materials to their brief as supportive of liability such as a State Department report, a State Department official's testimony, and statements made by the Reagan Administration.  Pls.' Exs. 4, 5, 6, 7, 8, 9.  These materials contain conclusory assertions as to Libya's responsibility for the La Belle bombing and the Libya State Defendants should be entitled to conduct discovery to ascertain the basis for the political conclusions contained therein.  Discovery will include subpoenas for all unclassified material and documents upon which the Reagan administration and the State Department relied in drawing conclusions as to Libya's responsibility.

18.     I declare under penalty of perjury that the foregoing is true and correct. Executed on April 15, 2008.


Dated: April 15, 2008                     /s/ Nicole Erb

# Exhibit 1



CONSEIL
DE L'EUROPE

COUNCIL
OF EUROPE

COUR EUROPÉENNE DES DROITS DE L'HOMME
EUROPEAN COURT OF HUMAN RIGHTS

FIFTH SECTION

**CASE OF CHRAIDI v. GERMANY**

*(Application no. 65655/01)*

JUDGMENT

STRASBOURG

26 October 2006

# <u>FINAL</u>

*26/01/2007*

*This judgment will become final in the circumstances set out in Article 44*
*§ 2 of the Convention. It may be subject to editorial revision.*

**In the case of Chraidi v. Germany,**

The European Court of Human Rights (Fifth Section), sitting as a Chamber composed of:

Mr    P. LORENZEN, *President*,
Mr    K. JUNGWIERT,
Mr    V. BUTKEVYCH,
Mrs   M. TSATSA-NIKOLOVSKA,
Mr    J. BORREGO BORREGO,
Mrs   R. JAEGER,
Mr    M. VILLIGER, *judges*,
and Mrs C. WESTERDIEK, *Section Registrar*,

Having deliberated in private on 2 October 2006,

Delivers the following judgment, which was adopted on that date:

# PROCEDURE

1. The case originated in an application (no. 65655/01) against the Federal Republic of Germany lodged with the Court under Article 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention") by a stateless person, Mr Yasser Chraidi ("the applicant"), on 27 November 2000.

2. The applicant was represented by Mr D. Lammer, a lawyer practising in Berlin. The German Government ("the Government") were represented by their Agent, Mrs A. Wittling-Vogel, *Ministerialrätin*, of the Federal Ministry of Justice.

3. On 21 November 2005 the Court decided to communicate the application. Applying Article 29 § 3 of the Convention, it decided to rule on the admissibility and merits of the application at the same time.

4. On 1 April 2006 this case was assigned to the newly composed Fifth Section (Rule 25 § 1 and Rule 52 § 1 of the Rules of Court).

# THE FACTS

## I. THE CIRCUMSTANCES OF THE CASE

5. The applicant, Mr Yasser Chraidi, was born in 1959 in Lebanon. When lodging his application, he was detained in Berlin. He is currently living in Lebanon.

6. On 1 August 1984 the Berlin Tiergarten District Court issued an arrest warrant in respect of the applicant on the ground that he was strongly suspected of having murdered E.

7. On 19 July 1990 the Berlin Tiergarten District Court issued a further arrest warrant in respect of the applicant and five other suspects, born in Lebanon, Libya or Morocco. The court accused the applicant of having prepared, with others, a bomb attack at the "La Belle" discotheque in Berlin on 5 April 1986 in order to kill as many members of the American armed forces as possible. During this terrorist attack three people had been killed and 104 had been seriously injured.

8. On 1 September 1992 the applicant was arrested by the police in Lebanon and was subsequently taken into detention with a view to extradition.

9. On 21 June 1994 a Lebanese court acquitted the applicant of E's murder but convicted him of forgery and sentenced him to one year and six months' imprisonment.

10. On 24 May 1996 the applicant was extradited to Germany and subsequently held in detention on remand on account of the arrest warrant issued in 1990.

11. On 25 November 1996 the Berlin Court of Appeal ordered the applicant's continued detention on remand. It held that the reasonable suspicion that the applicant had committed the offences with which he had been charged resulted, among other things, from the confession of one of the other suspects. The danger of his absconding still persisted because the applicant had been extradited to Germany only in May 1996 and had neither a fixed dwelling nor social ties in Germany which would prevent him from absconding if released. The court moreover referred to the lifelong prison sentence the applicant faced and underlined that more lenient preventive measures would not be suitable. Lastly, there had been no breach of the obligation to proceed speedily (*Beschleunigungsgebot*).

12. On 30 January 1997 the public prosecutor filed the bill of indictment. On 5 September 1997 the Berlin Regional Court opened the main proceedings against the applicant and four other accused. Between 1997 and 2000 the Berlin Court of Appeal repeatedly ordered the applicant's continued detention on remand.

13. On 13 January 2000 the Berlin Regional Court rejected a request by the applicant for release. It held that there was still a danger of his absconding. Furthermore, the reasonable suspicion that the applicant had committed the offences with which he had been charged persisted. The applicant's continued detention was also proportionate having regard to the serious nature of those offences, the prospective sentence, the importance of the case and the particular public interest in the prosecution of these offences. Furthermore, there had been no breach of the obligation to proceed speedily.

14. On 1 March 2000 the Berlin Court of Appeal upheld that decision. Concerning the suspicions as regards the applicant, the court pointed out that it was bound by the assessment of the Regional Court. Furthermore, the danger of the applicant's absconding persisted in view of the lifelong prison sentence he faced. The objective of his detention on remand could accordingly not be accomplished by alternative, less radical, preventive measures. Although the applicant had been detained since as far back as 8 January 1994, his further detention remained proportionate having regard to the importance of the case, the character and seriousness of the offences and the particular public interest in the prosecution of these offences. Referring to the principle of proportionality, the court underlined that a detainee's right to liberty could outweigh the public interest in the prosecution as time passed, if there was, for instance, an imminent risk of irreparable damage to his health. In the present case, however, nothing suggested that the applicant's life or health were at risk. Moreover, given that the Regional Court had continuously held two hearings per week since November 1997, the length of the proceedings could not be considered disproportionate.

15. On 24 May 2000 the Federal Constitutional Court refused to admit a complaint by the applicant, without giving any reasons. Its decision was served on the applicant's lawyer on 30 May 2000.

16. On 13 November 2001 the Berlin Regional Court convicted the applicant on three counts of aiding and abetting murder, on 104 counts of aiding and abetting attempted murder, and of aiding and abetting causing an explosion (*Herbeiführung einer Sprengstoffexplosion*). The court alluded to the historical background of the case, in particular to the tensions between the United States and Libya which had arisen following terrorist attacks in 1985. In January 1986 the United States Government had imposed a trade embargo on Libya and had ordered the freezing of all Libyan State assets in United States banks. These measures had led to military intervention and to the planning by Libyan nationals of terrorist attacks on United States facilities in Germany. The court further pointed out that the applicant's crimes were punishable by imprisonment for up to fifteen years and sentenced him to fourteen years' imprisonment. When determining the sentence, the court took into account, among other things, the fact that the applicant's detention on remand and the proceedings had lasted an unusually long time. It further determined that since 8 January 1994 the applicant had been detained in Lebanon with a view to extradition in connection with the present case. This period of detention was to be deducted from his prison sentence at a ratio of 1:3 until 30 April 1994 and at a ratio of 1:2 from 1 May 1994. The court moreover ordered the applicant's continued detention. The judgment, which ran to 380 pages, was served on the applicant's lawyer on 10 January 2003.

4                    CHRAIDI v. GERMANY JUDGMENT

17. The Berlin Regional Court delivered its judgment after having held 281 hearings with an average of two hearings per week and having heard 169 witnesses. The hearings, which lasted on average five hours each, were regularly attended by the five accused, their 15 lawyers, 106 joint plaintiffs, their 29 lawyers and three interpreters.

18. On 24 June 2004 the Federal Court of Justice dismissed appeals on points of law by the applicant and the public prosecutor.

19. On 28 April 2005 the applicant was released.

## II.  RELEVANT DOMESTIC LAW

20.  Section 117 of the Code of Criminal Procedure provides, *inter alia*:

> "As long as the accused is in detention on remand, he may at any time apply for a court hearing to determine whether the arrest warrant is to be revoked or whether its execution is to be suspended in accordance with Section 116."

21.  Section 230 of the Code of Criminal Procedure provides, *inter alia*:

> "No trial shall be held in respect of a person who is absent."

# THE LAW

## I.  ALLEGED VIOLATION OF ARTICLE 5 § 3 OF THE CONVENTION

22.  The applicant complained that his detention on remand had lasted an excessively long time. He invoked Article 5 § 3 of the Convention, which provides:

> "Everyone arrested or detained in accordance with the provisions of paragraph 1 (c) of this Article shall be brought promptly before a judge or other officer authorised by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release pending trial. Release may be conditioned by guarantees to appear for trial."

### A.  Admissibility

#### 1.  *Loss of standing as a victim*

23.  The Government contended that the applicant could no longer claim to be a victim because the Regional Court had explicitly acknowledged that his detention on remand had lasted an unusually long time and had taken this fact into account when determining his sentence.

24. The Court reiterates that a decision or measure favourable to the applicant does not in principle deprive the individual concerned of his status of victim within the meaning of Article 34 of the Convention (see *Labita v. Italy* [GC], no. 26772/95, § 142, ECHR 2000-IV; *Amuur v. France*, judgment of 25 June 1996, *Reports of Judgments and Decisions* 1996-III, p. 846, § 36; and *Dalban v. Romania* [GC], no. 28114/95, § 44, ECHR 1999-VI). However, as the Convention leaves to each Contracting State, in the first place, the task of securing the enjoyment of the rights and freedoms it enshrines (see *Cordier v. Germany* (dec.), no. 71741/01, 19 January 2006), this general rule is subject to an exception when the national authorities have acknowledged either expressly or in substance, and then afforded redress for, the breach of the Convention (see *Eckle v. Germany*, judgment of 15 July 1982, Series A no. 51, pp. 30-31, § 66; *Jansen v. Germany* (dec.), no. 44186/98, 12 October 2000; and *Beck v. Norway*, no. 26390/95, § 27, 26 June 2001). In cases concerning the failure to observe the reasonable-time requirement guaranteed by Article 6 § 1 of the Convention, the national authorities can afford adequate redress in particular by reducing the applicant's sentence in an express and measurable manner (see *Eckle*, cited above, pp. 30-31, § 66, and *Beck*, cited above, § 27). The Court has held that such a reduction of the sentence is also capable of affording adequate redress for a violation of Article 5 § 3 in cases in which the national authorities had failed to hear within a reasonable time the case of an applicant held in detention on remand (see *Dzelili v. Germany*, no. 65745/01, § 83, 10 November 2005).

25. Applying these principles to the present case, the Court observes that, although the Convention forms an integral part of the law of the Federal Republic of Germany (see *Eckle*, cited above, p. 31, § 67) and there was accordingly nothing to prevent the Regional Court from holding, if appropriate, that the length of the applicant's detention on remand had been in breach of the Convention, either expressly or in substance, the latter court merely conceded that the impugned detention had lasted an "unusually long" time (see paragraph 16 above). Furthermore, the Court is not satisfied that the applicant was afforded adequate redress for the alleged violation because the Regional Court failed to specify to what extent the applicant's sentence had been reduced on account of the length of his detention on remand (see *Dzelili*, cited above, § 85).

26. The Court therefore considers that the Regional Court's statement concerning the unusual length of the applicant's detention did not deprive the latter of his status of victim within the meaning of Article 34 of the Convention.

### 2. Exhaustion of domestic remedies

27. The Government maintained that the applicant had exhausted domestic remedies only in respect of his detention until 24 May 2000, the

date of the final decision by a domestic court concerning his request for release. They underlined that, once a certain period had elapsed after that decision, the applicant could have lodged a further application for release. As he had not availed himself of the opportunity to institute fresh proceedings before the domestic courts after the Federal Constitutional Court's decision of 24 May 2000, he had failed to exhaust domestic remedies in respect of his detention after that date.

28. The applicant did not submit any observations in reply within the time-limit fixed by the Court.

29. The Court refers to its case-law to the effect that an applicant should not usually be required to use at very short intervals a remedy which by its nature might be repeated an indefinite number of times (see *Rieme v. Sweden*, judgment of 22 April 1992, Series A no. 226-B, p. 67, § 50, and *Guzzardi v. Italy*, judgment of 6 November 1980, Series A no. 39, pp. 29-30, § 80). The re-examination of a case may, however, be appropriate where new facts have emerged which could furnish a separate basis for a fresh decision. In cases of continued detention for instance, the prolongation of the detention in itself may under certain circumstances justify a re-examination of the question of release (see *Lynas v. Switzerland*, no. 7317/75, Commission decision of 6 October 1976, Decisions and Reports 6, p. 167).

30. In the present case, the applicant had been held in detention on remand for exactly four years when the Federal Constitutional Court refused to examine his constitutional complaint. Under German law, the applicant could have lodged a further application for release at any time after that decision (see paragraph 20 above). However, having regard to the fact that on 13 November 2001 the Regional Court convicted the applicant and ordered his continued detention because of the persisting danger of his absconding, it is rather doubtful whether such a request in the period of time preceding the latter decision would have had any prospects of success. In any event, given that the applicant's detention on remand within the meaning of Article 5 § 3 ended with his conviction by the Regional Court on 13 November 2001 (see *Labita*, cited above, § 147), that is, eighteen months after the decision of the Federal Constitutional Court, the Court is not satisfied that the institution of fresh proceedings would have shortened the length of his detention on remand to a significant extent.

31. The Court therefore holds that the Government's preliminary objection concerning the exhaustion of domestic remedies must be dismissed.

32. The Court further notes that the complaint is not manifestly ill-founded within the meaning of Article 35 § 3 of the Convention and that it is not inadmissible on any other grounds. It must therefore be declared admissible.

## B.  Merits

### 1.  Period to be taken into consideration

33.  The period to be taken into consideration under Article 5 § 3 started with the applicant's transfer to Germany on 24 May 1996 (see *Nedyalkov v. Bulgaria*, no. 44241/98, § 61, 3 November 2005; and *De Wilde, Ooms and Versyp v. Belgium*, judgment of 18 June 1971, Series A no. 12, p. 39, § 71) and ended on 13 November 2001 with his conviction by the Berlin Regional Court (see paragraph 30 above). The applicant's detention on remand thus lasted five years and almost six months.

### 2.  Reasonableness of the length of detention

34.  The applicant submitted that the length of his detention on remand could not be regarded as justified for the purposes of Article 5 § 3 of the Convention. The Government contested this view.

35.  The Court reiterates that the issue of whether a period of detention is reasonable cannot be assessed *in abstracto*. Whether it is reasonable for an accused to remain in detention must be assessed in each case according to its special features and on the basis of the reasons given in the domestic decisions and of the well-documented facts mentioned by the applicant in his applications for release. Continued detention can be justified in a given case only if there are specific indications of a genuine requirement of public interest which, notwithstanding the presumption of innocence, outweighs the rule of respect for individual liberty (see *W. v. Switzerland*, judgment of 26 January 1993, Series A no. 254-A, p. 15, § 30, and *Labita*, cited above, § 152).

36.  The persistence of reasonable suspicion that the person arrested has committed an offence is a condition *sine qua non* for the lawfulness of the continued detention, but after a certain lapse of time it no longer suffices. In such cases, the Court must establish whether the other grounds given by the judicial authorities continued to justify the deprivation of liberty. Where such grounds were "relevant" and "sufficient", the Court must also ascertain whether the competent national authorities displayed "special diligence" in the conduct of the proceedings (see *I.A. v. France*, judgment of 23 September 1998, *Reports* 1998-VII, p. 2979, § 102, and *Labita*, cited above, § 153).

#### (a)  General approach

37.  The Court notes at the outset that the present case relates to large-scale offences committed in the context of international terrorism. States combating this form of terrorism may be faced with extraordinary difficulties. The Court, whose role it is to examine measures taken in this

regard by Contracting States as to their conformity with the Convention, is not oblivious of these difficulties. It sees no reason to depart from the general approach it has adopted in previous cases of a similar nature (see *Klass and Others v. Germany*, judgment of 6 September 1978, Series A no. 28, pp. 23 and 27-28, § 48-49 and 59; *Brogan and Others v. the United Kingdom*, judgment of 29 November 1988, Series A no. 145-B, pp. 27-28, § 48; *Murray v. the United Kingdom*, judgment of 28 October 1994, Series A no. 300-A, pp. 23-24, § 47; *Pantano v. Italy*, no. 60851/00, § 70, 6 November 2003; and *Van der Tang v. Spain*, judgment of 13 July 1995, Series A no. 321, p. 21, § 75). However, in the context of the issues arising in the present case the Court considers that the specific nature of these offences and, in particular, the difficulties intrinsic to the investigation of offences committed by criminal associations acting on a global scale call for special consideration. It will bear this context in mind when assessing the reasonableness of the length of the applicant's continued detention, in particular the grounds for his detention and the conduct of the proceedings in the light of the complexity of the case.

#### (b) Grounds for continued detention

38. As regards the grounds for the applicant's continued detention, the Court notes that the competent judicial authorities advanced three principal reasons for not suspending the arrest warrant, namely that the applicant remained under a strong suspicion of having committed the crimes of which he was accused, the serious nature of these offences and the fact that the applicant would be likely to abscond if released, given the sentence which he risked incurring if found guilty as charged.

39. The Court accepts that the reasonable suspicion that the applicant committed the offences with which he had been charged, being based on cogent evidence, persisted throughout the trial leading to his conviction. It also agrees that the alleged offences were of a serious nature.

40. As regards the danger of the applicant's absconding, the Court observes that the possibility of a severe sentence alone is not sufficient after a certain lapse of time to justify continued detention based on the danger of flight (see *Wemhoff v. Germany*, judgment of 27 June 1968, Series A no. 7, p. 25, § 14, and *B. v. Austria*, judgment of 28 March 1990, Series A no. 175, p. 16, § 44). In the present case the national courts also relied on other relevant circumstances, including the fact that the applicant had been extradited from Lebanon to Germany for the purposes of criminal proceedings in the context of international terrorism. He had neither a fixed dwelling nor social ties in Germany which might have prevented him from absconding if released. Accordingly, the Court is satisfied that a substantial risk of the applicant's absconding persisted throughout his detention and accepts the domestic courts' finding that no other measures to secure his presence would have been appropriate. It further observes that under

German legislation no trial can be held in respect of an accused who has absconded and whose whereabouts are unknown (see paragraph 21 above).

41. Consequently, the Court concludes that there were relevant and sufficient grounds for the applicant's continued detention.

#### (c) Conduct of the proceedings

42. It remains to be ascertained whether the judicial authorities displayed "special diligence" in the conduct of the proceedings.

43. The Court takes the view that the applicant's case was extremely complex. It concerned serious charges against him and four co-defendants and necessitated the hearing of 169 witnesses. The case had a terrorist and international background and, moreover, involved 106 joint plaintiffs.

44. As to the conduct of the proceedings by the judicial authorities, the parties agreed that no delay in the proceedings had been attributable to the German courts and authorities, which had displayed the necessary diligence throughout the proceedings. The Court notes that, following the applicant's indictment on 30 January 1997, his trial in the Berlin Regional Court began on 5 September 1997. Hearings took place on 281 separate days with on average two hearings per week until the Regional Court's decision of 13 November 2001. The hearings were regularly attended by five defendants, their fifteen lawyers, 106 joint plaintiffs and their 29 lawyers. Accordingly, having regard to the difficulties intrinsic to the prosecution of offences committed in the context of international terrorism, the competent judicial authorities cannot be said to have displayed a lack of special diligence in handling the applicant's case.

45. In the light of these various factors, the Court finds that the competent national court acted with the necessary special diligence in conducting the proceedings in the applicant's case.

#### (d) Overall assessment

46. The Court has found in previous cases that detention on remand exceeding five years constituted a violation of Article 5 § 3 of the Convention (see *Korchuganova v. Russia*, no. 75039/01, § 77, 8 June 2006; *I.A. v. France*, cited above, p. 2983, § 112; and *Khudoyorov v. Russia*, no. 6847/02, § 189, ECHR 2005-X).

47. The present case involved a particularly complex investigation and trial concerning serious offences of international terrorism which caused the death of three victims and serious suffering to more than one hundred. Following his extradition from Lebanon in 1996, the sole reason for the applicant's presence in Germany was to stand trial for these offences.

48. In these exceptional circumstances, the Court concludes that the length of the applicant's detention can still be regarded as reasonable. There has accordingly been no violation of Article 5 § 3 of the Convention.

## II. ALLEGED VIOLATION OF ARTICLE 6 § 2 OF THE CONVENTION

49. The applicant complained that the length of his detention on remand violated the presumption of innocence. He relied on Article 6 § 2 of the Convention, which provides:

> "Everyone charged with a criminal offence shall be presumed innocent until proved guilty according to law."

50. The Court observes that this complaint is based on the same facts as the complaint under Article 5 § 3 and must be likewise declared admissible (see paragraph 32 above).

51. Given that the Court takes into account the presumption of innocence when assessing whether the length of a period of pre-trial detention was justified (see *Kudła v. Poland* [GC], no. 30210/96, § 110, ECHR 2000-XI, and *Labita*, cited above, § 152), no separate question arises under Article 6 § 2. There is accordingly no need to examine the complaint about the length of the applicant's detention on remand under this Article also.

## III. ALLEGED VIOLATION OF ARTICLE 6 § 1 OF THE CONVENTION

52. In his first letter to the Court, the applicant submitted that the length of the criminal proceedings against him had not been proportionate. However, he also observed that the German authorities could not be held responsible for the unusual length of the impugned proceedings. In his subsequent submissions, the applicant underlined that the national authorities had observed their obligation to proceed speedily throughout the proceedings and that the length of the proceedings was rather due to the complexity of the case and the number of persons involved in the proceedings.

53. The Government argued that the applicant had obviously not intended to raise the length-of-proceedings complaint.

54. The Court notes that the applicant's submissions concerning on this point are disputable as he underlined that the German authorities and courts could not be held responsible for the unusual length of the proceedings. Furthermore, he failed to submit any clarification in response to the Government's allegation that he had not complained about the length of the proceedings. The Court therefore finds that the applicant failed to substantiate his length-of-proceedings complaint with sufficient clarity.

55. Even assuming that domestic remedies have been exhausted, this part of the application is accordingly manifestly ill-founded and must be rejected as inadmissible pursuant to Article 35 of the Convention.

## FOR THESE REASONS, THE COURT UNANIMOUSLY

1. *Declares* the complaint about the length of the applicant's detention on remand admissible and the remainder of the application inadmissible;

2. *Holds* that there has been no violation of Article 5 § 3 of the Convention;

3. *Holds* that there is no need to examine the complaint about the length of the applicant's detention on remand under Article 6 § 2 of the Convention;

Done in English, and notified in writing on 26 October 2006, pursuant to Rule 77 §§ 2 and 3 of the Rules of Court.


Claudia WESTERDIEK                           Peer LORENZEN
Registrar                                    President

In accordance with Article 45 § 2 of the Convention and Rule 74 § 2 of the Rules of Court, the concurring opinion of Mr Borrego Borrego is annexed to this judgment.

P.L.
C.W.

## CONCURRING OPINION OF JUDGE BORREGO BORREGO

For the purpose of a review under Article 5 § 3 of the Convention, the Court's case-law establishes two criteria: the grounds for the continuous detention and the conduct of the proceedings. On the basis of both criteria, the Court examines the particular circumstances of the case and decides on the reasonableness of the length of the applicant's detention on remand. In the present case, the Court has applied these general criteria (see paragraphs 37 to 45 of the judgment) and has examined the unusual, even exceptional, circumstances of this case (281 hearing-days, among others). The Court has therefore held that there has been no violation of the Convention. This is also my conclusion.

I nevertheless respectfully disagree with the preambular paragraph 37 as well as with the use of the words "international terrorism", which are repeatedly mentioned, up to four times in all (paragraphs 37, 40, 44 and 47).

Firstly, I find the initial considerations in paragraph 37 regarding international terrorism superfluous. In my opinion, they could lead readers to think that, in addition to the above-mentioned general criteria which characterise its jurisprudence, the Court has created a new criterion, concerning a specific category of crime: international terrorism. I think that international terrorism is not and should not be considered as a criterion. On the contrary, the nature of the crime has to be examined as part of the particular circumstances of every case.

The very specific and relevant circumstances of the instant case are weakened by the fact that the two general criteria are locked in between the initial general approach and the final overall assessment, which stresses the international terrorism aspect. I am convinced that there is no violation of the Convention, because the application of the two general criteria to the present case so proves. The insistence on referring to international terrorism and the special weight given to this crime is, in my opinion, unnecessary, and it could be dangerous for the Convention system.

Finally, I would like to express my complete disagreement with the expression "international terrorism". Not only is it wrong, but it could lead to misunderstandings. Indeed, it could give rise to questions or doubts. For instance, one might wonder whether there are different categories of the crime called terrorism and whether these different categories have different consequences. One might also wonder whether terrorism can be considered "international" depending on the terrorists' nationality (in which case, would the attack of 7 July 2005 in London, where the alleged perpetrators were British, be considered an example of international terrorism?). Other

CHRAIDI v. GERMANY JUDGMENT – CONCURRING OPINION OF JUDGE BORREGO    13
BORREGO

questions may arise regarding the different nationalities and roles of those who plan the attack, those who finance it and those who execute it. And regarding the victims of terrorism, are there different categories of victim, depending on the type of terrorism? That would be repugnant.

"Popular democracy", "organic democracy" and other similar expressions became part of European history and we all remember this. I would therefore gently ask the Court not to insist on using qualifications, and thus trying to make artificial distinctions, with respect to something that is purely and simply a crime: terrorism.

# Exhibit 2

**BGH 5 StR 306/03 – Decision of June 24, 2004 (LG Berlin)**

**Murder (base motives in case of terrorist motives; "La Belle" case; determination on the basis of views of the German legal community); prohibited interrogation methods (deception; prerequisites for proving complaints about procedural irregularities); motion for the admission of evidence for interrogating a witness residing abroad (due assessment of the circumstances; availability; evidentiary anticipation); delineation between aiding and abetting and complicity; reduced criminal responsibility (relevancy as point of law).**

**§ 211(2), StGB; § 21 StGB; § 25(2) StGB; § 27 StGB; § 344(2), sentence 2 StPO; § 244(5), sentence 2 StPO; § 136a StPO**

Headnotes

**1.   Anybody who uses a bomb attack to intentionally kill third parties uninvolved in the political conflict for terrorist motives acts from base motives (bomb attack on "La Belle," a discotheque in Berlin, in 1986). (BGHSt)**

**2.   A motive is always to be evaluated on the basis of the standards reflected by the views of the legal community of the Federal Republic of Germany and not the views of a group of people who do not recognize the ethical and legal values of that legal community (cf. BGHR StGB § 211(2) base motives 41; BGH NJW 2004, 1466—meant for publication in BGHSt—with further annotations). (author)**

**3.   According to judicial decisions of the German Federal Court of Justice, the criteria for complicity are fulfilled if someone participating in the crime does not only wish to promote the actions of others, but wishes his contribution to be part of the action of the other party and, conversely, wishes the latter's activity to be a complement to his own part in the crime. Whether a participant has such a close relationship to the crime must be evaluated on the basis of the entire circumstances encompassed by his view. Material indications for such complicity are the degree to which the party is interested in the success of the action, the extent of his participation in the crime and the control over the crime or at least the intent to have control over the crime, which means that implementation and success of the crime depend decisively on his wish (BGHSt 37, 289, 291; BGH StV 1998, 540 with further supporting documents). In marginal cases the Federal Court of Justice leaves some scope of judgment for the trier of fact to evaluate the issue. If the decision appealed from shows that the trier of the fact has recognized the aforementioned standards and has fully appreciated all the facts, the court of appeal may not interfere with the judgment on the grounds of error of law even if the trier of fact could have arrived at a different *ratio decidendi* (BGH StV 1998, 540 with further supporting documents). (author)**

**4.   The appellant, who wishes to assert a violation of procedural law, must indicate the facts underlying the complaint in such a complete and precise way that the court of appeal is able to evaluate on the basis of the statement of grounds alone whether a procedural irregularity exists, if the facts claimed are proven (BGHSt 3, 213, 214; 21, 334, 340; 29, 203). (author)**

Operative provisions

The appeals on points of law

1) of the prosecutor

2) of the joint plaintiffs Ba, Be, Br, Ed, El, Fre, Gra, Kan, Laub, Mar, Mas, McC, Mö, I and M N, No, Nu, Pf, Red and St, as appellants, as well as 3) of defendants V C, A C, C and E against the decision of the Berlin Regional Court of November 13, 2001 are rejected.

Defendants V C, A C, C and E shall bear the costs of their appeals as well as the resulting necessary expenses incurred by the non-appealing joint plaintiffs. The costs of the appeals by the public prosecutor as well as the necessary costs incurred by the defendants as a result of the appeals shall be borne by public funds. The appealing joint plaintiffs shall bear the costs of their appeals. Joint plaintiff Br shall bear the necessary expenses incurred by defendant H as a result of his appeal.


Reasons


The Regional Court has sentenced Defendant V C to prison terms between 12 and 14 years for (jointly committed) triple murder in concurrence with attempted murder in 104 cases and for an intentionally caused bomb explosion; the court sentenced Defendants A C, C and E to the same prison sentence for aiding and abetting this crime. Defendant H was found not guilty. In its appeal on the merits the public prosecutor objects—also on the grounds of complaints about procedural irregularities—that Defendants A C, C and E were not sentenced for participating in the crime as accomplices, that Defendant V C received the benefit of mitigating circumstances on account of the allegation that her accountability was considerably reduced, and that in the case of none of the defendants based motives were assumed as an additional element of murder. In the final analysis, the public prosecutor seeks a sentencing of these four defendants to life imprisonment. In different motions the joint plaintiffs also object to the fact that the decision was not based on complicity. Furthermore, one of the joint plaintiffs challenges the fact that Defendant H was found not guilty. The defendants that were convicted have themselves lodged appeals as well.

All appeals have remained unsuccessful.

A.

Facts

According to the findings of the Regional Court, tensions between the U.S. and Libya had risen since January 1986. Approximately in Mid-March 1986 Libyan authorities commissioned the "Libyan People's Office" located in East-Berlin (the Libyan

representation responsible for the GDR, hereinafter called "LVB") to commit terrorist attacks against U.S. institutions in Germany.

The LVB had initially planned an armed attack on an American bus, shuttling U.S. military personnel between West and East Berlin on a daily basis, to take place on East Berlin soil. Defendant C, a member of the Palestinian terrorist organization PFLP-GC, was accredited with the LVB as a so-called technical employee. He was involved in these plans; his car with diplomatic license plates was to be used in the attack. Defendant E resided in East Berlin between 1985 and 1986. He was an employee of the Libyan Ministry of Propaganda as well as a member of so-called revolutionary committees. During his frequent contacts with the LVB he met Defendant C. Although not himself involved in the planning of the attack, he knew about it and did not do anything to prevent it. Defendant A C had been living in West Berlin since 1976. In 1982 he was recruited by the East German Ministry for State Security (MfS) as an informer (IM); his duty was to obtain information especially on Arabs living in West Berlin. He reported to his MfS contact about his meetings with Defendants C and E, including the planned actions against Americans. Presumably due to the surveillance activities ordered by the MfS as a result of this information, the plan to commit an attack on the U.S. bus in East Berlin was abandoned.

On March 19, 1986 at the latest, a plan was developed instead to launch an armed attack on the same bus in West Berlin. In preparation of such an action, Defendant C, together with a diplomatic courier employed by the LVB, transported handguns and hand grenades from East to West Berlin. Defendants C, A C and E participated in a meeting to discuss details of the planned attack. Due to the refusal to take part in this attack on the part of A J, who had close ties to the PFLP-GC, this plan was also no longer pursued by the LVB. The matter was concluded in so far as the weapons were brought back to East Berlin.

Between March 20 and 25, 1986, Defendants E and A C, together with the PFLP-GC-affiliated IM, scouted out U.S. institutions located in West Berlin to investigate their suitability for an attack. However, these assets were rejected as potential targets for such attacks by LVB-diplomats A K and A E. The further course of action between March 25 and 30, 1986, could only be clarified in part by the Regional Court. Individuals close to the LVB looked actively for discotheques in West Berlin frequented by Americans. On March 29, 1986, Defendant A C informed his contact at the MfS of the names of three such nightclubs that had been shortlisted. On March 30, 1986 at the latest, Defendant A C gave Defendant E a note written by Defendant V C with the names and addresses of these three discotheques. How this note came into being could not be clarified. When Defendant E traveled from West to East Berlin on March 30, 1986, GDR border control agents discovered the note and made a photocopy that was subsequently forwarded to the MfS. Defendant E then gave the note to diplomat A K. The LVB decided that a discotheque by the name of "La Belle" would be the target of the attack.

In favor of all defendants, the Regional Court did not exclude that they were not involved in determining the final target of the attack. Between March 30 and April 4, 1986 at the latest, Defendants E and C learned of the LVB's decision to proceed with a

bomb attack on the "La Belle" discotheque. Using 1,500 grams of plastics explosives made available by the LVB, a bomb was to be built at Defendant V C's apartment located in Berlin-Kreuzberg, in the presence of Defendants V and A C. V C was to be ordered to bring this bomb into the nightclub and to trigger it.

Against the background of the conflict between the U.S. and Libya, Defendants E and C decided to take part in this attack and to harm the United States; Defendant E also hoped that this action would increase his chances for becoming accredited with the LVB. What motivated Defendant V C, who like Defendant A C was an MfS informer, to make her apartment available and to execute the attack, has remained unclear. With regard to Defendant A C as well, the court was unable to determine a clear motive why he committed the criminal act.

On April 4, 1986 the wife of Defendant C picked up the explosives from the LVB and brought it to Defendant V C. On the same evening, the explosives and a detonator were fabricated into a bomb at the apartment of Defendant V C. At that point in time, Defendants V and A C, C and E, as well as H—who had been found not guilty— a sister of Defendant V C, were at the apartment. The criminal division was unable to determine any active involvement on the part of any of the defendants in fabricating the bomb. It could not be determined which of the defendants fabricated the bomb and who instructed Defendant V C in its use. In view of diverging information obtained from Defendants E and A C, it has been assumed in favor of each of defendants E, C, and A C, that it was always the two others who assembled the bomb.

Between 10 and 11 PM, Defendants E, C and A C left the apartment. Prompted by Defendant V C, her sister agreed to accompany the others to the "La Belle" discotheque; however, it is possible that she thought they would just embark on a "normal" visit to a club. Defendant V C transported the bomb to the nightclub in a bag, activated the timed detonator, and left the club together with her sister; more than 200 people were in the disco. The bomb exploded at around 1:45 AM of April 5, 1986. Three people died from grave injuries caused by the explosion; many other visitors and employees of the club suffered injuries of various degrees.

B.

Appeals of the public prosecutor

I.  Procedural complaints

1.  On the basis of two procedural complaints, the appellant claims a violation of the duty of the court to clarify matters (§ 244 (2) StPO), because the Regional Court failed to use the statements by Defendant E made during the preliminary proceedings.

a)  Firstly, the appellant asserts that the Regional Court was wrong in affirming a prohibition to use these statements in accordance with § 136a (3), StPO. It alleges as follows:

During his interrogation at the German embassy on Malta on September 10, 1996, as well as during four subsequent interrogations in Germany between October and December 1996, Defendant E had made confessionary statements. The appellant argues that the criminal division was wrong in not using this information gained from the defendant during the preliminary proceedings. Contrary to the court's view the legal instructions provided to Defendant E by the public prosecutor prior to his first interrogation did not contain any deception within the meaning of § 136a StPO. The decision appealed from, he claims, was also based on the erroneous assumption of an exclusion of evidence improperly obtained: If the Regional Court had considered the information provided by Defendant E, it would have had to sentence at least Defendants C and A C not only for aiding and abetting murder, but also for complicity in committing a crime.

In the opinion of the trier of the fact Defendant E was deceived insofar as he was given the wrong impression that, in the event of a guilty verdict, confessionary information was very likely to mitigate his sentence irrespective of the significance of his contribution to the crime conceded by him. This happened even though at the time Defendant E was accused of complicity to multiple murders, a crime to be punished by life imprisonment, without the possibility of a confession being able to mitigate such punishment. The criminal division did not follow the statement provided in the main proceeding by the senior prosecutor responsible for the instructions to Defendant E that he considered the confession as a basis for examing the gravity of the defendant's guilt under § 57a StGB.

b)  The complaint had not been asserted properly (§ 344(2), sentence 2, StPO).

The appellant, who wishes to assert a violation of procedural law, must indicate the facts underlying the complaint in such a complete and precise way that the court of appeal is able to evaluate on the basis of the statement of grounds alone whether a procedural irregularity exists, if the facts claimed are proven (BGHSt 3, 213, 214; 21, 334, 340; 29, 203; BGHR StPO § 344(2), sentence 2 complaint for presumed partiality 1, law on motions for admission of evidence 2, appreciation of evidence 3, last word 1, 3 and exclusion of evidence improperly obtained 5, st. Rspr.).

The statements of grounds for appeal of the public prosecutor do not comply with these requirements. In its appreciation of the evidence regarding the content of the discussions in the hotel in the reasons for its decision the Regional Court used a note written by the senior prosecutor dated December 3, 1996 according to which "Defendant E must expect imprisonment of four to seven years for his crimes" (UA page 198.) Without complete knowledge of this note, which was not communicated by the court of appeal, the division of the higher court is unable to review whether the legal instructions to Defendant E involved a deceit of the accused or simply an ambiguous statement.

c)  Accordingly, the additional complaint that the judgment treated the statements of Defendant E made during the preliminary proceedings as unusable also due to an infringement of the duty to inform under § 168c(5), sentence 1, StPO, is irrelevant. The complaint cannot be successful for the reason alone that the Regional Court, with regard to this statement, has affirmed the assumption of an exclusion of evidence improperly obtained under § 136a(3), StPO, which was not effectively challenged by the appeal.

BGH 5 StR 306/03 – Decision of June 24, 2004 (LG Berlin)

_____

2.   To the extent that the appellant, in its complaint about the clarification of the matter (§ 244(2) StPO), complains about the fact that witnesses He and Gav were not interrogated, he cannot be successful. The Regional Court, without any errors of law, based the rejection of the pertinent motion for admission of evidence on § 244(5), sentence 2, StPO. According to this provision a motion for admission of evidence for interrogating a witness residing abroad can be rejected if the interrogation of that individual, according to the court's due assessment of the circumstances, is not necessary, without the availability of that witness having to be reviewed (BGHSt 40, 60, 62; Meyer-Goßner, StPO 47th edition, § 244 StPO, marginal number 43 et seq).

It is already doubtful whether the arguments brought forward by the public prosecutor in his appeal are complete (§ 344(2), sentence 2, StPO). There are no details—included in the files—on the background regarding the named witnesses; such background would be material for the evaluation under § 244(5), sentence 2 in connection with (2) StPO. In any case the complaint is without merits. In his evaluation under § 244(5), sentence 2 StPO, the trier of fact is allowed to base his consideration on the existing evidence. In view of this fact the criminal division, without error of law, has shown that even if the witnesses had confirmed the alleged facts, due to the evidence that was already taken in connection with the facts to be proven, there were no further findings to be expected that could have influenced its conviction. In view of the boastful attitude of Defendant C it is, for legal reasons, not objectionable that the criminal division did not want to conclude from his alleged statements to witness He that a perpetrator's will existed. Contrary to the assertion in the appeal, the fact that Defendant C planned attacks together with diplomat A K was not the subject of the motion for the admission of evidence.

3.   The complaint about clarification of facts on the basis of which the appeal objects that the trier of fact failed to read aloud the police interrogation of an accused party, taking place in 1991 as well as the interrogation by the judge of foreign witness A, taking place in 1993, required under § 251(2), sentence 2 and § 251(1), no. 2 StPO, respectively, is also unsuccessful. The appellant fails to indicate on the basis of what circumstances the criminal division, after almost 8 years, should have assumed that the actual bases for such an oral recitation, which the appellant invoked, still continued to exist. Furthermore, the trier of fact was not obligated to draw the conclusion desired by the appellant as to Defendant C's will as a perpetrator from the facts that were subject of the evidence.

II.   Point of law appealed [*Sachrüge*]

Without significant success, the public prosecutor's appeals—to that extent in concurrence with the attorney general—on the basis of a point of law appeal, are directed against the fact that the Regional Court should have punished Defendants C, A C and E as accomplices, that in the case of Defendant V C it should not have based its decision on a considerable reduction of her accountability within the meaning of § 21 StGB, and that it should have affirmed base motives as an element of murder regarding all four defendants.

1.   Defendants C, A C and E

a)   To the extent that the public prosecutor, to the disadvantage of the defendants and with the objective of a more severe punishment, objects to the fact that they were only sentenced for aiding and abetting murder, it is not successful.

_____

aa) According to precedent by the Federal Court of Justice, complicity exists if a party involved in a crime does not only wish to further the actions of another party, but wishes his contribution to be part of the activities of the other party and, conversely, wishes the latter's actions to be a supplement to his own part in the crime. Whether a participant has such a close relationship to the crime must be evaluated on the basis of the entire circumstances encompassed by his view. Material indications for such complicity are the degree to which the party is interested in the success of the action, the extent of his participation in the crime and the control over the crime, or at least the intent to have control over the crime, which means that implementation and success of the crime depend decisively on his wish (BGHSt 37, 289, 291; BGH StV 1998, 540 with further supporting documents). In marginal cases the Federal Court of Justice leaves some scope of judgment for the trier of fact to evaluate the issue. If the judgment that is subject to the appeal shows that the trier of the fact has recognized the aforementioned standards and has fully appreciated all the facts, the court of appeal may not interfere with the judgment on the grounds of error of law even if the trier of fact could have arrived at a different *ratio decidendi* (BGH StV 1998, 540 with further supporting documents).

bb) Based on the findings by the Regional Court it could have stood to reason to view the defendants as accomplices and not just as aidors and abettors. However, the division of the higher court must consider that in the face of the unusually difficult situation and in parts scarce evidence the Regional court has based its appreciation of the evidence of the direct actions only on minimum findings supported by facts or identical information provided by several defendants, thereby acting free of errors of law. Besides, the defendants are not the masterminds and actual instigators of the bomb attack; its target was determined by the LVB, the office that also delivered the explosives used in the attack.

Therefore, from the perspective of appeals law, taking into consideration the relevant criteria, the decision of the Regional Court that Defendants C, A C and E were abettors rather than accomplices, is to be accepted. The Regional Court found that none of these defendants was involved in transporting the bomb to the discotheque and activating the detonator, or was even present when Defendant V C activated the detonator in the nightclub. Furthermore, the Regional Court considered that the senior employees of the LVB—both also members of the Libyan secret service—"were the masterminds with regard to all considerations and steps involved in the planning." (UA page 351, 359, 364)

With regard to the findings about the direct preparation and execution of the attack, the criminal division could only rely on the statements of Defendants E and A C and, with regard to the meeting in the apartment on April 4, 1986, also on the information provided by Defendant V C. Other evidence, in particular the interrogation of witnesses, did not yield any relevant information. The statements made by Defendants A C and E regarding the plans for attacks against U.S. institutions in March 1986 as well as about the preparation of the bomb attack at issue here were widely divergent. Even after sifting through all the details of both statements and their thorough evaluation, the trier of fact was incapable of considering one of the pleadings as more reliable by comparison to the other. Therefore the Regional Court has very carefully evaluated information that contained charges against others and, in the final analysis, based its findings on the "smallest common denominator" of these statements, unless a certain statement of a defendant could be confirmed by additional evidence that was sufficient to convince the Regional Court. Therefore, in many instances

BGH 5 StR 306/03 – Decision of June 24, 2004 (LG Berlin)

the statements of the defendants—although they could not serve as a basis for safe findings—could also not be refuted sufficiently to convince the court. To that extent, the court opted in each case in favor of the variation that proved to be more favorable for the defendant concerned, applying the principle of "*in dubio pro reo.*"

With regard to an attack on an American bus, the criminal division could only find that the defendants were involved in an unspecified way in planning activities that were subsequently abandoned. As far as the attack on the discotheque was concerned, it could also not be determined that the defendants were involved in the planning and preparation.

Based on the reasons for the decision it has to be assumed that Defendants C and E from the LVB were only instructed to support the realization of the plan of action by their presence in the apartment, that they only wished to assume that function and that Defendant A C was only made aware of the concrete plan of action after he had arrived at the apartment. Beyond their presence in the apartment and the approval and support of the plan expressed to the others by their presence, no other contributions to the crime by the defendants could be found. In favor of each one of them the criminal division, without error of law, has assumed that he was not actively involved in the assembly of the bomb. Although, in his evaluation, the trier of fact did not specifically discuss that all three defendants had participated in a meeting with A J, who was intended as a participant in the planned attack on an American bus, this circumstance, contrary to the opinion of the appeal, is not meaningful with regard to a possible complicity of the defendants. It could not be determined what role the defendants played in this meeting and what duties they were to be assigned in the planned attack.

There are also no other circumstances that had to prevent the trier of fact from assessing the defendants' contributions to the crime as constituting aiding and abetting. In particular, these circumstances are not necessarily resulting from the findings about the way these individuals are affiliated with the LVB and their other activities. The fact that accordingly another assessment on the part of the trier of fact—in particular with regard to Defendants E and C, also in view of their political motivation, as determined—could have been possible, does not give rise to the necessity for interference by the court of appeal.

b)  The Regional Court has judged the crime, without errors of law, as perfidious and as murder committed by means dangerous to the public. However, the trier of fact denied that murder from base motives as another element of murder existed because "the political motive…could not fulfill this element of murder, especially because the pluralism of evaluations has to be taken into account." (UA page 356, 357)  This assessment is wrong and in this respect the public prosecutor, joined by several joint plaintiffs, is justified in his complaint. Besides, the comments of the Regional Court give rise to the concern that it might have misjudged the preconditions for assuming the existence of abetting murder from base motives.

The defendants can be sentenced for aiding and abetting a murder from base motives if V C or their accomplices—the Libyan masterminds and actual initiators of the bomb attack—acted from base motives and if they themselves, as accessories, made their contributions to the crime either from base motives as well, or in awareness of the base motives of the accomplices (st. Rspr., cf. BGH NStZ 1996, 384, 385 with further supporting documents). According to the findings, these preconditions are fulfilled in this case.

Anybody who uses a bomb attack to intentionally kill third parties uninvolved in the political conflict for terrorist motives acts from base motives. It is evident that this applies to the Libyan masterminds of this attack and to Defendants C, A C and E themselves. The evaluation of the question whether motives for a crime are "base," i.e., according to general ethical evaluation, are on the lowest level, and thus—to a markedly further-reaching degree than in the case of homicide—appear reprehensible and therefore particularly despicable, must be based on an overall assessment of all external and internal factors relevant for the perpetrator's motivations (cf. BGHSt 35, 116, 127; BGH StV 1996, 211, 212). The circumstances found by the criminal division in this connection allow for an evaluation by the higher court division of the motive as "base." The random, indiscriminate and therefore arbitrary selection of uninvolved human beings as victims justifies the classification of the motive as being "base." (cf. BGHSt 47, 128, 132 with further supporting documents; Jähnke in LK 11th edition, § 211 marginal number 27; Schneider in MünchKomm-StGB § 211, marginal number 79, 85) The decision of the Federal Court of Justice in the case "Startbahn West" (NStZ 1993, 341; in contrast: Jähnke and Schneider in the place cited) does not conflict with this evaluation, because the individual case in that case, both in terms of motivation and selection of victims, has significant peculiarities; in the case at issue here the victims were completely uninvolved. Besides, the devastating uncontrollable use of bombs or mines is *a priori* particularly inhuman (cf. BGHSt 40, 218, 232; 44, 204, 209; v. Selle NJW 2000, 992, 996).

The defendants' origin, i.e. Lebanon and Libya, respectively, countries where for reasons of political infatuation and far-reaching indoctrination, the bomb attack on the discotheque may have been approved by some people, cannot matter for an overall assessment of whether the motive for the killing is to be assessed as base. A motive is always to be evaluated on the basis of the standards reflected by the views of the legal community of the Federal Republic of Germany and not the views of a group of people who do not recognize the ethical and legal values of that legal community (cf. BGHR StGB § 211(2) base motives 41; BGH NJW 2004, 1466—meant for publication in BGHSt—with further annotations).

c) The assumption that Defendants C, A C and E were aiding and abetting murder, even from base motives, and the resulting deviation from the legal view of the trier of fact do not result in a reversal of the decision appealed from and a remission of the matter to a new trial and decision. The Federal Court of Justice has already decided that if one murder element is correctly affirmed, the erroneous denial of another murder element does not put the validity of the guilty verdict at risk, if, with regard to the murder element that was erroneously treated, further findings by the trier of fact are not required, as is the case here (cf. BGHR StPO § 353(1) partial reversal 1). The division of the higher court also excludes that the new affirmation of base motives as an additional element of murder, which does not need to be included in the operative provisions of the decision, would have any effect on the verdicts; they could continue as rendered. The punishments have been properly differentiated and are within the upper limit of the correctly determined range of punishment. The Regional Court, for which the numerical number of the elements of murder was not decisive in determining the punishment, did consider the terrible facts of the crime. In addition to the upper limit of 15 years imprisonment for aiding and abetting murder specified under § 211(1) StGB in connection with § 27(2), § 49(1) No. 1 StGB, there is the factor that

BGH 5 StR 306/03 – Decision of June 24, 2004 (LG Berlin)

---

the time that has passed since the crime—in the meantime even more so—would have to be considered in mitigation (cf. BGHR StGB § 46(2), delay of proceedings 13).

    2.  Defendant V C

    a) The Regional Court did not exclude the possibility that the defendant's accountability was considerably reduced due to the effects of depression in connection with a histrionic personality disorder, even though Mr. Krö, a psychiatric expert who was heard during the main proceeding, assumed that the expert evaluation did not yield sufficient indications for reduced criminal responsibility.

    aa) There are no overall legal concerns against applying § 21 StGB.

    Although in the final analysis the Regional Court did not follow the expert opinion of the psychiatric expert, this was not indicated *de jure* because the court-appointed expert, for the evaluation of the point of fact whether at the time the crime the defendant suffered from a pathological mental disorder, is to provide the judge only with the findings determined by him and insight into the medical issue, but he cannot release the judge from the responsibility to render a decision on the issues being raised. (cf. BGHSt 8, 113, 117 et seq.; BGH GA 1962, 116). The review of the relevancy of reduced accountability within the meaning of § 21 StGB involves a point of law (BGHSt 8, 113, 124; Jähnke in LK 11th edition § 21 marginal number 8 et seqq., with further supporting documents), which the trier of fact has to answer in his sole responsibility (BGHR StGB § 21 expert 11). In the final analysis, no errors of law are recognizable, neither with regard to the Regional Court's appreciation of the evidence on the existence of a pathological mental disorder nor its legal evaluation that such a disorder had materially impaired the defendant's accountability within the meaning of § 21 StGB.

    The expert could not find for sure, but he also could not exclude, that at the time of the crime the defendant suffered from moderate depression within the meaning of the international classification issued by the World Health Organization (WHO) (ICD-10 F33), to be considered a pathological mental disorder as defined in § 20 StGB. Following its own review the criminal division [of the regional Court] concurred with this view.

    In addition, again applying the principle "*in dubio pro re*," the court could not exclude that, due to the effects of a depressive phase that might have been in the waning phase, the defendant's position to act according to its view of wrongfulness could have been but substantially reduced. In this connection the expert emphasized that the symptoms typical for depression, such as inability to master simple every-day tasks, reduced concentration and low self-esteem, usually result in a situation or allow the assumption that depression inhibits rather than promotes a person's willingness to commit a crime. If the defendant, at the time of the crime, had been in a depressive phase and had still been in a position to purposefully go ahead with the attack, it would, in his view, only be conceivable if she had committed this crime despite the depression, but not as a result of the depression. The Regional Court then proceeded to discuss with the expert the existing uncertainties in connection with the evaluation with which the court was faced on hand of pertinent psychiatric literature. The expert objected to the view expressed in that literature that a depression could create a "loosening of the overall personality." However, he did concede

---

that there might be case constellation in which depression could result in reduced criminal responsibility of the perpetrator. Forensic psychiatry has yet to conclude decisively what effects depression in the waning phase could have on the conduct of perpetrators.

Against this background, the criminal division was unable to exclude that, on the one hand the defendant, due to the waning of the symptoms of the illness, was even able to commit the crime, but that on the other hand, due to the illness, her control mechanisms were suspended to such an extent that she was able to act according to her views of what is wrong only to a much lesser degree. In this connection two characteristics were decisive. For one thing the expert additionally diagnosed a histrionic personality disorder (ICD-10 F60.4), characterized by a strong dependence on admiration, theatrical attitudes connected with this craving for recognition, as well as by affects to exaggerate and "making yourself the center of attention," which, in the justifiable view of the Regional Court, together with the waning depression, could have impaired the defendant's inhibitions to a large extent. Secondly, despite may years of main proceedings, neither the expert nor the Regional Court were able to clarify the defendant's motive to commit such a bomb attack fifteen years ago with sufficient certainty. However, even according to the explanations of the expert, the clarification of the motive for a crime has material significance in evaluating a perpetrator's criminal responsibility. It is therefore conceivable to the trier of fact that in view of the constellation—not excluded here—of waning depression with a histrionic component, the defendant acted approximately with the following idea in mind: "I don't care about anything anyway, but at least the whole world will talk about me." (UA page 339) The Regional Court itself sees its doubt founded on the uncertainties named by the expert himself in evaluating the case, uncertainties that he could not dispel also when discussing the relevant psychiatric professional literature.

bb) The evaluation by the trier of fact is defensible especially in view of the considerable influence by third parties on the defendant's decision to commit the crime. In the final analysis the objections raised by the appellant are without success.

The appeal is wrong in missing concrete connecting facts to support that the defendant could have suffered from moderate depression. The criminal division correctly explicated that to that extent the statements of Defendants E and A C only carry little weight (cf. also BGH, decision of March 31, 2004 – 5 StR 351/03) and explained, in concurrence with the expert, that it is not unusual for people with depressive tendencies to no longer be able after many years to describe their mental state at a certain point in time dating back many years. For early summer of 1985 and December 1986, at least moderate depression has been certified, as well as in a medical certificate dating from 1994 (UA page 33, 150, 329). The trier of fact did not have, for legal reasons, to assume on the basis of MfS reports about meetings with the defendant that depressive phases existed only at the two points in time stated in these certificates.

The fact that, according to her statement, the defendant did not want to go to the discotheque alone, and asked her sister to go with her, does not conflict with the assumption of a severe depressive phase. It does not fully exclude the ability to proceed purposefully. The division of the higher court is also not concerned that the criminal division, in reviewing the defendant's motive, could have overlooked that she was unemployed at the time of the crime and did not receive any financial support from Defendant A C. The trier of fact has

extensively, and without errors in law, discussed any motives from financial or other material reasons (UA page 296-298).

b)  To the extent that the Regional Court, with regard to Defendant V C, did not assume the existence of base motives as an element of murder, this circumstance, in view of that defendant's considerable diminished accountability—which was not excluded—does not give rise to the same overall concerns as in the case of the three other defendants (cf. with regard to the existence of the subjective requirements for base motives as an element of murder BGH NJW 2004, 1466—designed for publication in BGHSt—with further supporting documents). Since she is an accomplice, it is relevant as far as she is concerned whether she herself acted from base motives. According to the Regional Court's findings, Defendant V C acted by and large without a motive and her action was—at least it cannot be excluded—guided by depressive phases that did, however, not exclude her ability to act purposefully. Due to this conception, it cannot be derived with certainty from the reasons for the decision whether the subjective requirements for base motives as an element of murder are also fulfilled in the defendant's case. However, this does not necessitate a remission of the case. For the same reasons as with the three other defendants, in the case of Defendant V C as well, any impact on the guilty verdict or the penalty would have to be rejected.

C.

Appeals of the joint plaintiffs

I.  Appeals of Joint Plaintiff Br 1.

The admissibility of the appeal against the decision to sentence Defendant V C for jointly committed murder fails on the basis of § 400(1) StPO. Because the Regional court evaluated the homicide as murder, with regard to this offense that is subject to the civil action, the joint plaintiff's appeal could only achieve another legal consequence of the crime; with this objective he cannot challenge the decision (cf. BGHR StPO § 400(1) admissibility 12).

2. The appeal against the not-guilty verdict of Defendant H remains unsuccessful.

a)  The complaint against irregularities in the proceedings does not stand. The rejection of the subsidiary motion for admission of evidence in the reasons for the decision as meaningless is not objectionable on legal grounds. The trier of fact is free to consider a possible evidentiary fact as meaningless if it could not influence the decision even if it were proven, because the court, in its discretionary evaluation of evidence, does not wish to draw a possible, albeit not imperative, conclusion from the fact (cf. BGHR StPO, § 244(3), sentence 2, meaninglessness 2, 4 and 23, with further supporting documents).

b)  The point of law appealed is unfounded.

The appreciation of the evidence is free of errors of law and in particular does not infringe any principles of thought or experience. The fact that another evaluation by the trier of fact could have been possible, and might have even stood to reason, does not yet entitle the court of appeal to interfere.

3. The appeals directed against Defendants C, A C and E, too, remain unsuccessful.

a) The appeals against procedural irregularities, directed against the fact that Defendants C, A C and E were not sentenced as accomplices, go astray.

The appeal's allegation that no decision had been rendered on the subsidiary motions to admit evidence filed on the 274th day of the main proceeding, is wrong. These motions were rejected in the decision as mere repetitive motions and because of the court's own expertise in the matter, respectively (UA page 202 et seqq, 238).

b) To the extent that point of law appealed is directed against the fact that Defendant C was not sentenced as an accomplice, it is unfounded (cf. comments on the public prosecutors' point of law appealed and II. decision of the highest court, below). The appeal of the joint plaintiff is inadmissible to the extent that it is also directed at the affirmation of the otherwise base motives as additional element of murder. Assuming an additional element of murder could, at the most, have an impact on the decision on the legal consequences. However, under § 400(1) StPO, a joint plaintiff cannot challenge a decision with the objective that another legal consequence of the crime be imposed (cf. BGH NJW 1999, 2449).

4. To the extent that the court, under § 405, sentence 2, stop, refrained from deciding on the motion for compensation for pain and suffering in the adhesive procedure, the appeal is inadmissible, if only because to that extent the petitioner does not have any recourse to such appeal (§ 406a(1) StPO).

II.   Appeals of the other appealing joint plaintiffs

The appeals of joint plaintiffs Ba, Be, Ed, El, Frei, Gra, Kan, Laub, Mar, Mas, Mc C, Mö, I and M N, No, Nu, Pf, Red and St are unfounded to the extent that they are directed against the fact that Defendants C, A C, and E were not convicted for murder committed as accomplices, because the review of the decision appealed from did not yield any error in law to the disadvantage of the joint plaintiffs. To that extent we refer to the comments relating to the public prosecutors' point of law appealed.

The higher court division does not ignore that, especially from the perspective of the victims, some of whom suffered considerable injuries and were gravely affected, the sentence of only temporary imprisonments—owing to the difficult evidentiary and legal situation—may not be easy to understand. This applies all the more as another decision of the Regional Court would have been just as justifiable and therefore would have been just as acceptable from an appeals law point of view. In all of this it also has to be considered that it was not the actual principals—Libyan masterminds and agents—that were being tried.

D.

Appeals of the defendants

I.   Appeal of Defendant C

BGH 5 StR 306/03 – Decision of June 24, 2004 (LG Berlin)

_____

1.   In connection with the determination of the standard by which the detention for purposes of extradition in Lebanon should be converted, and of the period that should be counted towards imprisonment, no violation of § 261 StPO is identifiable. Contrary to the allegations of the appeal, the opinion obtained from the German Foreign Office [*Auswärtiges Amt*] regarding conditions in Lebanese prisons is in conformance with the evaluations of the Regional Court. The determination of a prison term served by the defendant in Lebanon until January 1994 may have been introduced into the main proceeding on the basis of witness testimony by an investigator, possibly on the basis of a notification from Lebanon that was made part of the files.

2.   The review of the decision as to the general point of law appealed does not yield any error of law to the detriment of the defendant.

II.  Appeal of Defendant A C

The review of the decision as to the general point of law appealed does not yield any error of law to the detriment of the defendant.

III.  Appeal of defendant V C

1.   In the final analysis without success, the appeal objects to the infringement of § 136(1) sentence 1 and § 136a(1), sentence 1 stop, because the defendant, prior to her testimony to the public prosecutor, was allegedly not properly informed and instructed; allegedly this results in an exclusion of evidence improperly obtained.

The Regional Court was correct in opining that the interrogating senior prosecutor would have been obligated to inform the defendant, prior to the beginning of the interrogation, about the fact that charges were brought, as well as the actual extent of the charges in the complaint. However, the criminal division was right in rejecting exclusion of evidence improperly obtained. The defendant was informed of her right to remain silent. Beyond that no relevant deficit of information existed. As a result of the arrest warrant the defendant knew that the charge, in addition to killing three people, would extend to other victims as well; to assess the crime, from a legal point of view, as attempted murder, suggests itself in view of the fact that a bomb explosion is uncontrollable.

2.   The review of the decision as to the additional complaint about procedural irregularities and the point of law appealed does not yield any error of law to the detriment of the defendant.

IV.  Appeal of Defendant E

The appeals against the determination of the penalty, which is the substance of the point of law appealed, cannot be successful.

1.   The fact that the trier of fact considered the circumstance that the defendant had "already been involved in preparatory action for a long time before the attack" (UA page 377) as aggravating holds up to an objective/legal review. The strength of a perpetrator's wish (§ 46(2), sentence 2, StGB) can also be seen from actions in preparation of an offense. In view of the existing findings of facts, nothing speaks for conduct, in which an attempt to

_____

commit an offense was abandoned—which could have led to mitigating circumstances for the defendant—being applied in error of law.

2. There are no sustainable indications for assuming that the punishment of the appellant, by comparison to that given to Defendant A C was too high in error of law (cf. in this regard Tröndle/Fischer, StGB, 51st edition, § 46, marginal number 25a).

# Exhibit 3

Westlaw.

NewsRoom

5/15/01 MIDDLEENEWS (No Page)                                      Page 1


5/15/01 Middle E. News Online (Pg. Unavail. Online)
2001 WLNR 10138364

                      Middle East News Online

Copyright 2001 VOICE OF AMERICA NEWS. This news item is distributedvia Middle East
  News Online (MiddleEastWire.com) All rights reserved.May not be redistributed,
   published or used for broadcast withoutprior written authorization from Middle
                            East News Online.

                            May 15, 2001


        Germany, Libya Deny Gadhafi Admitted Ties To Terrorist Incidents

   Both Germany and Libya are denying reports that Libyan leader Muammar Gadhafi
told a  German official Libya was behind two deadly terrorist attacks in the
1980s.

   A German spokesman says Mr. Gadhafi distanced himself from terrorism during a
meeting  this March with Michael Steiner, chief foreign policy adviser to Chancel-
lor Gerhard  Schroeder, but the two did not discuss terrorist cases of the past.

   A Libyan spokesman says the report by a German newspaper is void of truth, and
that  Mr. Steiner could not have attributed such statements to Mr. Gadhafi.

   A Frankfurt newspaper said Tuesday that Colonel Gadhafi admitted to Mr. Steiner
that  Libya was responsible for the 1986 bombing of the La Belle disco in Berlin
and the 1988  bombing of a Pan Am flight over Lockerbie, Scotland. The disco bomb-
ing killed five people  and injured more than 200 others, while the Lockerbie at-
tack killed 270.

   The paper says Mr. Steiner spoke of Mr. Gadhafi's admission during a recent
meeting  with Mr. Schroeder and President Bush in Washington. The paper cites a
German memo about  the meeting that was leaked to attorneys for the disco bombing
survivors.

   The memo added that Colonel Gadhafi said he had renounced terrorism and wants a
chance  to prove his country's new position.

   Five people have been on trial since 1997 for the disco bombing. A lawyer for
the  survivors says he plans to call Mr. Steiner as a witness to testify about his
talks with  the Libyan leader.

                      ---- INDEX REFERENCES ----

NEWS SUBJECT:  (International Terrorism (1IN37))

                © 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:06-cv-00732-RWR    Document 46-2    Filed 04/15/2008    Page 43 of 52

REGION:  (United Kingdom (1UN38); Germany (1GE16); Scotland (1SC90); Europe
(1EU83); Central Europe (1CE50); Africa (1AF90); Libya (1LI91); North Africa
(1NO44); England (1EN10); Arab States (1AR46); Western Europe (1WE41); Mediter-
ranean (1ME20))

Language:  EN

OTHER INDEXING:  (Gadhafi, Muammar; Steiner, Michael)  (LA BELLE; PAN AM)
(Admitted Ties; Gadhafi; Michael Steiner; Muammar Gadhafi; Schroeder; Steiner)

Word Count: 292
5/15/01 MIDDLEENEWS (No Page)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



# GERMANY DENIES GADHAFI ADMITTED TO BOMBINGS

From: <u>United Press International</u>    Date: <u>May 16, 2001</u>

United Press International

05-16-2001

Germany denies Gadhafi admitted to bombings

BERLIN, May 15, 2001 (United Press International via COMTEX) -- The German government denied reports that Libyan leader Moammar Gadhafi admitted involvement in two of the worst terrorist bombings of the 1980s, reports said Wednesday.

The denial followed reports in the German press on Tuesday that Gadhafi had admitted to a German official he had a role in the bombing of the Pan Am airliner that crashed over Lockerbie, Scotland, in 1988 and in the assault on a Berlin discotheque two years earlier.

More than 270 people were killed in the Pan Am crash while three in the attack on the La Belle disco, which was frequented by U.S. soldiers. Two American soldiers and a Turkish woman were killed in the attack and more than 200 were injured.

The government, however, admitted that Michael Steiner, a foreign-policy adviser to Chancellor Gerhard Schroder, did meet Gadhafi on March 17 to discuss international terrorism, as reported by the Frankfurter Allegemeine Zeitung newspaper.

But the government said the two did not discuss past terrorist attacks.

The reported admission of guilt by Gadhafi arose from a diplomatic cable leaked during its transmission from the German embassy in Washington to the German foreign ministry in Berlin.

The cable, written by German ambassador Jurgen Chrobog, was a report on Schroder's visit to Washington in March.

During the visit on March 29, Steiner briefed senior U.S. officials on his discussions with Gadhafi on international terrorism.

According to Allgemeine Zeitung, Steiner was also present during a meeting between the German chancellor and President Bush.

The German newspaper also claims to have received a confidential account of the official briefing on Steiner's meeting with the Libyan leader.

Five people have been on trial in Germany since 1997 for the attack on the Berlin disco, which occurred when tensions between the United States and Libya were at their peak. President Ronald Reagan ordered air raids on Libya shortly thereafter.

A lawyer, representing the victims and their relatives, has asked Steiner to testify before the court about his conversation with Gadhafi.

Prosecutors in Berlin have also demanded to see the German ambassador's cable to the foreign ministry about Steiner's talks with the Libyan leaders.

They also expressed concern about the government's attitude saying that they did not understand why the government failed to inform the court if it had received a confession from Gadhafi about the La Belle discotheque attack.

A British newspaper, The Independent, reported Wednesday that Gadhafi's admission is seen as important step toward reintegrating Libya into the international community and having U.N. sanctions lifted. Acceptance of responsibility for acts of terrorism is a key demand of the United Nations for the lifting of the sanctions imposed after the Lockerbie bombing.

Sanctions were suspended after Tripoli agreed to hand over two suspects for the Lockerbie bombing. But Britain and the United States say the sanctions will not be officially lifted and could be re-imposed unless the Libyan regime accepts the terrorist responsibility condition.

So far authorities in the West have had difficulty linking Gadhafi to the bombings. It has proved even more difficult to convict those suspected of the bombing of Berlin's La Belle discotheque in 1986.

SUBJECT CODE: 02000000 03000000 11000000 16000000

Copyright 2001 United Press International (via Comtex). All rights reserved

Provided by ProQuest LLC. For permission to reuse this article, contact Copyright Clearance Center.

Academic and Education    Business    Government    Health    Lifestyle and Personal Interest    News
Sports and Leisure    Technology and Science

HighBeam™ Research, Inc. © Copyright 2008. All rights reserved.

www.highbeam.com







SAVE THIS | EMAIL THIS | Close



# Memo leak embarrasses Germany

**BERLIN, Germany -- A leaked high-level memo has angered and embarrassed the German government, which has launched an inquiry to find the culprit.**

The sensitive memo, summarising talks between Chancellor Gerhard Schroeder and U.S. President George W. Bush during a summit meeting in Washington in March, has found its way into the German media.

Opposition politicians want an inquiry mounted into the affair.

Press reports say the memo reveals that Schroeder's foreign affairs adviser Michael Steiner told Bush of an admission by Libyan leader Moammar Gadhafi that he was behind the bombings of a Berlin discotheque and a PanAm airliner over Lockerbie, Scotland, in the 1980s.

It is also said to contain unflattering comments by the German and U.S. leaders about other world figures, including Palestinian leader Yasser Arafat and Jordan's King Abdullah II.

On Wednesday, the German parliament's foreign affairs committee quizzed Foreign Minister Joschka Fischer and Steiner about the leak.

While an embarrassed Fischer has called the affair "extremely annoying," observers say the diplomatic fall-out is more serious.

Russian President Vladimir Putin -- a subject of the Bush-Schroeder talks -- says the memo's publication is a "provocation," while Jordan, Libya and the U.S. have expressed concern over the document's content.

Both Germany and Libya say Gadhafi did not admit to being involved with the attacks.

"There has not been such an embarrassment in German foreign policy for decades," Theo Waigel, the former finance minister and senior member of the conservative Christian Social Union.

Fischer insisted that media accounts of the contents of the 10-page memo had not harmed German diplomacy.

But he acknowledged: "The entire business is more than annoying."

After the hearing, Fischer said it had dealt with all important questions arising from the affair but had not uncovered who had leaked the memo, and added that no one would be sacked over the affair.

"Today's session dealt exhaustively with all the questions," Fischer said. "I would just like to know one thing: Who was it?"

According to press reports, part of the classified memo reported that Gadhafi had apparently admitted to involvement in the 1988 Lockerbie bombing and the 1986 attack on the La Belle nightclub, in West Berlin, used by U.S. servicemen.

Gadhafi "admitted Libya had taken part in terrorist activities (La Belle, Lockerbie)," the cable read, apparently quoting Steiner.

"He declared that he has renounced terrorism and asked for a chance to prove Libya's new stance," it said.

The German government acknowledges that Steiner and Gadhafi had a secret meeting on March 17 at which the Libyan

leader distanced himself from terrorism, but it says individual cases were not discussed.

The La Belle bombing killed three people and wounded two hundred.

Five people, including a Libyan, are now on trial and lawyers have asked Steiner to give evidence on June 5.

But on Wednesday Fischer reiterated the government's position that Gadhafi had made no such admission.

"It is completely clear that there has been absolutely no explanation on the side of Gadhafi which is legally relevant or relevant to evidence," he said, adding Gadhafi had also made no general admission of involvement in state-sponsored terrorism.

**Find this article at:**
http://archives.cnn.com/2001/WORLD/europe/05/31/germany.memo/index.html

 Click to Print

☐ Check the box to include the list of links referenced in the article.

SAVE THIS | EMAIL THIS | Close

© 2008 Cable News Network

# Gadhafi Is Said to Have 'Sworn Off' Practice : Libya Reportedly Admits A Terrorist Role in 1980s

**By John Schmid**                                    Published: WEDNESDAY, MAY 16, 2001

**FRANKFURT:** - The Libyan leader, Moammar Gadhafi, admitted to a senior German official two months ago that Libya had been involved in terrorism in the past but said the country has now "sworn off" the practice, a leading German newspaper and a Berlin law firm said Tuesday, citing a confidential German diplomatic cable.

The newspaper, Frankfurter Allgemeine Zeitung, and the law firm, which is representing victims of a 1986 terrorist bombing of a Berlin discotheque, quoted the cable as saying that Colonel Gadhafi had confirmed that Libya was involved in the La Belle discotheque bombing and the bombing of Pan Am Flight 103 over Lockerbie, Scotland, in 1988.

The reports drew a carefully worded denial from the German government. It said Tuesday that Colonel Gadhafi had "distanced himself from terrorism" in the March 17 conversation with Michael Steiner, the top foreign policy adviser to Chancellor Gerhard Schroeder. But the government denied that Mr. Gadhafi had said anything about the Lockerbie or discotheque bombings.

"Individual cases from the past were not discussed," Uwe-Karsten Heye, Mr. Schroeder's main spokesman, said Tuesday afternoon. "Gadhafi distanced himself from terrorism in this talk," he said. "It was about issues of fighting international terrorism."

The statement followed a front-page story Tuesday in the Frankfurter Allgemeine, which reported on the message from the German Embassy in Washington to the German Foreign Ministry in Berlin.

The


Get HBO HD
and over 40 more
of your favorites.

Order dishHD
for only
$29.99/mo.

START SAVING ▶

dish
NETWORK

### Today on IHT.com

Berlusconi reclaims power in Italy

Scientists may have found Titanic's weak link

Rowling calls competing 'Harry Potter' book a travesty

memo, dated March 31, described a meeting two days earlier in the White House between Mr. Schroeder and President George W. Bush, with Mr. Steiner present. Also attending the meeting were Secretary of State Colin Powell and the national security adviser, Condoleezza Rice, as well as the German ambassador, Juergen Chrobog.

The message quoted Mr. Steiner as saying that Colonel Gadhafi told him previously that "Libya had been involved in terrorist activities" and that he "declared that he had sworn off terrorism and asked for a chance to prove Libya's new position." Attorneys who represent survivors of the attack on the discotheque and families of those killed said earlier Tuesday that they had seen a copy of the diplomatic message but declined to release a copy of it.

The law firm filed a motion Tuesday in a Berlin court to call Mr. Steiner as a witness in the disco bombing trial. But if he is called, Mr. Steiner could apply for the right not to testify, once on the stand, on national security grounds.

The United States has blamed Libya for both the Lockerbie and La Belle bombings.

The explosion of the Pan Am jetliner killed 270 people. In 1999, Colonel Gadhafi handed over two Libyans for trial. A Scottish court in The Hague convicted one of them in February of involvement in the Lockerbie bombing and acquitted the other. Libya denies responsibility in the attack and has refused to pay reparations.

The trial in the Berlin disco bombing has gone on since November 1997 with five defendants. The explosion killed two U.S. soldiers and one Turkish woman and left 230 wounded.

.

**Home** > News                                              Back to top

### Most E-Mailed

24 Hours   |   7 Days   |   30 Days

1.  Patients in U.S. foot more of the bill for vital drugs
2.  A city where you can't hear yourself scream
3.  How to write 200,000 books, with a computer's help
4.  Recession, what recession?
5.  As Cairo gets louder and louder, many simply turn a deaf ear
6.  Tibet backers show China value of PR
7.  Beijing takes sweeping measures to combat pollution ahead of Olympics
8.  Sarkozy and the embarrassment quotient
9.  New Spanish cabinet includes first woman defense minister
10. The happy scavengers of online journalism



INTERNATIONAL
**Herald Tribune**                                    iht.com/f1

**F1 qualifying to be modified for safety reasons**

More from Formula 1:
   At Renault, Alonso returns to his roots
   Aspiring engineers on mini track to a Grand Prix career
   A youthful fascination with Grand Prix racing

Ads by Google

**Intuit Online Payroll**
Payroll and taxes made easy Learn more & get 3 months FREE!
Payroll.Intuit.com

**Anti-Bush Stickers & Gear**
Jan 20 2009 -- The End of an Error Cheney-Satan '08, Impeach Bush, etc.

Case 1:06-cv-00732-RWR     Document 46-2     Filed 04/15/2008     Page 49 of 52

**Herald Tribune**

| | |
|---|---|
| **News:** | Americas | Europe | Asia - Pacific | Africa & Middle East | Technology & Media | Health & Science | Sports |
| **Features:** | Culture | Fashion & Style | Travel | At Home Abroad | Blogs | Reader Discussions | Weather |
| **Business:** | Business with Reuters | World Markets | Currencies | Commodities | Portfolios | Your Money | Funds Insite |
| **Opinion:** | Opinion Home | Send a letter to the editor | Newspaper Masthead |
| **Classifieds:** | Classifieds Home | Properties | Education Center |

| | |
|---|---|
| **Company Info:** | About the IHT | Advertise in the IHT | IHT Events | Press Office |
| **Newspaper:** | Today's Page One in Europe | Today's Page One in Asia | Publishing Partnerships |
| **Other Formats:** | IHT Mobile | RSS | AudioNews | PDA & Smartphones | Netbites | IHT Electronic Edition | E-Mail Alerts | Twitter |
| **More:** | Daily Article Index | Top 10 | Hyper Sudoku | IHT Developer Blog |

**Search**

**Subscriptions**
Sign Up | Manage

Contact Us | Site Index | Archives | Terms of Use | Contributor Policy | Privacy & Cookies

Copyright © 2008 the International Herald Tribune All rights reserved

Westlaw.                                                                NewsRoom

5/19/01 Times (U.K.) (Pg. Unavail. Online)
2001 WLNR 3271934

Times (UK)
Copyright © 2004 News International Ltd. All rights reserved.

May 19, 2001

Berlin feud over Gaddafi link to blast

Roger Boyes in Berlin

A LEAKED diplomatic cable that has linked Colonel Gaddafi with a terrorist attack
in Berlin is embarrassing Gerhard Schroder, the German Chancellor, muddying his
relations with President Bush and sparking a feud between the Chancellery and the
Foreign Ministry.

The uproar has highlighted the fundamental differences between Washington and
Europe about how to deal with so-called rogue states such as Libya, North Korea,
Iran and Iraq when they start to behave themselves. The West has a policy on how
to ostracise and punish those who support terrorism but has yet to devise a common
way of rehabilitating international wrongdoers.

Michael Steiner, the Chancellor's foreign policy adviser, visited Tripoli in
March against a backdrop of German companies seeking more business with Libya.
One, Wintershall, has angered the US Administration by applying for drilling
rights in an oilfield abandoned by the US in Libya after sanctions were imposed on
Colonel Gaddafi. Herr Steiner followed his Libya trip with a visit to Washington
on March 29 and held talks with Mr Bush, Colin Powell, the Secretary of State, and
Condoleezza Rice, the National Security Adviser.

According to the leaked cable, Herr Steiner reported that Colonel Gaddafi had ad-
mitted responsibility for a 1986 attack on La Belle discotheque in West Berlin.
Many US servicemen were injured and three people died. The terrorists had smuggled
explosives and detonators through East Berlin, evidently with the knowledge of the
Stasi. The trial of three men is under way here. Lawyers representing the victims
and survivors of the attack, excited by the cable, have called Herr Steiner to
testify about his conversation with Colonel Gaddafi.

But shortly after the cable was quoted in the German press this week, Herr Stein-
er denied that Colonel Gaddafi had confessed to terrorism. His conversation with
the US Administration had, he said, been misrepresented. Yet the cable was written
by Jurgen Chrobog, the German Ambassador to Washington, a highly respected diplo-
mat. Herr Chrobog had written what he had heard and Herr Steiner had been handed
an early version of the cable for his approval. The ministry is backing the ambas-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

sador.

 A credible theory about the cable is that Herr Steiner spoke too freely and now
regrets it. An alternative explanation is that the cable was leaked by the German
Foreign Ministry to embarrass Herr Steiner and speed his departure from the Chan-
cellery. This is not out of the question but would be largely self-defeating. The
leaker would have to be a mischief-maker determined to drive a wedge between the
Social Democratic Chancellor and his Green Foreign Minister.

 The third possibility is that the Americans leaked a copy of the German cable.

 There is a debate under way within the US Administration about Libya. It is not
entirely clear how to treat Colonel Gaddafi following the trial of the Lockerbie
bombers. An article by Ray Takeyh, an influential Washington academic, in the
latest issue of Foreign Affairs sets out the case of the moderates. "The Adminis-
tration ought to accept the possibility of rogue states' rehabilitation ... the
Libyan case can provide a model for how to deal with a revolutionary regime that
has grown weary of its isolation and ostracism."

 President Bush, sensitive to the complaints of the US oil industry which feels it
is losing ground to Europe in the Libyan market, seems to be in sympathy with this
approach. However, the existence of rogue states is an essential justification of
his anti-missile shield; if the rogues are all given the stamp of approval,
European critics of missile defence will be able to argue that the shield is re-
dundant.

 (c) Times Newspapers Ltd, 2001

                      ---- INDEX REFERENCES ----

NEWS SUBJECT:  (International Terrorism (1IN37); International Issues (1IN59);
Government (1GO80))

REGION:  (Germany (1GE16); Europe (1EU83); Central Europe (1CE50); Africa (1AF90);
USA (1US73); Libya (1LI91); Americas (1AM92); North Africa (1NO44); North America
(1NO39); Western Europe (1WE41); Mediterranean (1ME20))

Language:  EN

OTHER INDEXING:  (C) TIMES NEWSPAPERS LTD; CHANCELLERY; CHANCELLOR; FOREIGN MIN-
ISTRY; GERMAN FOREIGN MINISTRY; GREEN FOREIGN; LEAKED; NATIONAL SECURITY ADVISER;
SOCIAL DEMOCRATIC CHANCELLOR; WINTERSHALL)  (Bush; Colin Powell; Condoleezza Rice;
Gaddafi; Gerhard Schroder; Herr; Herr Chrobog; Herr Steiner; Jurgen Chrobog; Mi-
chael Steiner; Ray Takeyh; Roger Boyes; Steiner)

Word Count: 747
5/19/01 TIMESUK (No Page)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.                                                NewsRoom

5/15/01 BBCINTLR 00:00:00                                          Page 1

5/15/01 BBC Int'l Rep. 00:00:00

                    BBC INTERNATIONAL REPORTS
        Copyright © 2004 BBC Monitoring Service. All rights reserved.

                          May 15, 2001

  (CORR) Libya: Official criticizes   German  report on 1986 Berlin disco bombing

 (Correcting title and name of   German  official from "head of the chancellor's
office, (Frank-Walter) Steinmeier", to "Foreign Affairs adviser at the Chancellery
(Michael) Steiner". A corrected version of the item follows)

 Text of report by Libyan news agency Jana

 Tripoli, 15 May: A Libyan official has strongly denied the report of the German
daily Frankfurter Allgemeine Zeitung, in which the foreign affairs adviser at the
Chancellery, (Michael) Steiner, was quoted as saying that Col Mu'ammar al-Qadhafi
had admitted to him Libya's responsibility in the blowing up of the Berlin night
club (in 1986).

 In a statement to the press today, brother Hassunah Shawish, assistant secretary
for culture and information at the General People's Committee for Foreign Liaison
and International Cooperation, condemned this report which he described as unfoun-
ded and a clear fabrication aimed at serving suspicious objectives and plots.

 He went on to say that the report was falling within the framework of the anti-
Libyan campaign especially after Col Al-Qadhafi's success in uniting Africa and
his distinguished role at the world scene once the world realized that the two
Libyan nationals in the Lockerbie case were innocent.

 Shawish stressed that Steiner, who visited Libya recently as the especial envoy
of the German Chancellor (Gerhard) Schroeder, could not have made such a state-
ment. In this respect, he believed what the newspaper had attributed to him was a
fabrication and quotes which could not have made by him. He stressed that spread-
ing such reports is an attempt to drive a wedge between Libya and Germany in view
of their excellent relations.

 Source: Jana news agency, Tripoli, in Arabic 1600 gmt 15 May 01

 BBC Monitoring. Copyright BBC

Word Count: 349
5/15/01 BBCINTLR 00:00:00
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.