# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Katherine Harris, | : | |
| | : | |
| et al., | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| | : | CV 06-0732 (RWR) |
| v. | : | |
| | : | |
| SOCIALIST PEOPLE'S LIBYAN | : | |
| ARAB JAMAHIRIYA (Libya) | : | |
| | : | |
| et al. | : | |
| | : | |
| Defendants | : | |
| ——————————————————: | | |

**PLAINTIFFS' OPPOSITION TO LIBYAN DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page No.**

PROCEDURAL BACKGROUND ..................................................................3

STATEMENT OF FACTS .......................................................................4

SUMMARY OF ARGUMENT.....................................................................8

ARGUMENT..............................................................................................9


**I.  PLAINTIFFS MAY BRING THEIR CASE UNDER THE FOREIGN SOVEREIGN IMMUNITES ACT AS AMENDED BY SECTION 1083 OF THE DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2008**………………………………………………………….…………………..9

**A.  Section 1083 Of The Defense Authorization Act For Fiscal Year 2008 Explicitly Allows Plaintiffs To File Their Amended Complaint Under 28 U.S.C. § 1605A**.. ..........................................................................9

**B.  This Case Was Timely Filed Under 28 U.S.C. § 1605(f).** ...........................13

**C.  Defendant Failed To Raise The Statute Of Limitations Defense, Which Is An Affirmative Defense**..........................................................................19


**II.  LIBYA'S PECULIAR INTERPRETATION OF THE TERM "EXTRA-JUDICIAL KILLING" DEFIES LOGIC, THE EXPLICIT LANGAUGE OF THE STATUTE AND ITS LEGISLATIVE HISTORY** .............................23


**III.  PLAINTIFFS' ALLEGATIONS IN THIS CASE SATISFY THE REQUIREMENTS OF 28 U.S.C. § 1605A AND ALLOW THE COURT TO ASSERT SUBJECT MATTER JURISDICTION** .........................................27


CONCLUSION ...........................................................................................30

COME NOW the Plaintiffs, by and through counsel, and hereby file this Memorandum of Law with Points and Authorities in Opposition to Libyan Defendants' Motion to Dismiss. In opposition to said Motion, Plaintiffs rely on the following Memorandum.

## PROCEDURAL BACKGROUND

This case springs from the same set of events and includes the same Defendants (but not the same Plaintiffs) as <u>Beecham v. Socialist People's Libyan Arab Jamahiriya</u>, 01-cv-02243 (RWR).

The complaint in this case was filed on April 21, 2006 and the complaint and summons were served on July 6, 2006. Defendants' initial deadline to respond was September 6, 2006.

This case was thereafter stayed while government-to-government talks proceeded with the aim of settling <u>Beecham</u>, which would or would not resolve this case. As the Court is aware <u>Beecham</u> has been stayed on occasion while the parties entered into settlement negotiations either directly or through government-to-government talks.

On January 28, 2008 Congress amended the Foreign Sovereign Immunities Act ("FSIA") and created a viable and uniform claim for damages under federal law by passing the National Defense Authorization Act for Fiscal Year 2008. Pub. L. No. 110-181, § 1083 (2008). ("DAA 2008"). Section 1083 of the DAA 2008, attached as Exhibit 1, amends the FSIA by deleting 28 U.S.C. § 1605(a)(7), which was previously known as, the "state-sponsored terrorism" exception to sovereign immunity, and under which this case was brought, and replacing it with 28 U.S.C. § 1605A. Section 1083 of the DAA 2008 also deleted 28 U.S.C. § 1605(f), the statute of limitations provision for the former state-sponsored terrorism exception and replaced it with 28 U.S.C. § 1605A(b).

Pursuant to Fed. R. Civ. P. 15(a), Plaintiffs moved the Court for leave to amend their complaint based upon a change in controlling law and to deny Defendants' pending Motion to Dismiss.  On March 3, 2008 the Court granted Plaintiffs' Motion to Amend the Complaint and denied Defendants' Motion to Dismiss, without prejudice, as moot.  On April 12, 2008, Defendants filed a motion to dismiss the Amended Complaint.  On May 5, 2008, the Court granted Plaintiffs' unopposed request for an extension of time to respond and reset the deadline for their time to respond to May 16, 2008.

Plaintiffs respectfully request a hearing on Defendant's Motion to Dismiss.

## STATEMENT OF FACTS

On April 5th, 1986 a bomb exploded within the La Belle Discotheque, which was well-known as a spot where off-duty U.S. service personnel congregated, resulting in the deaths of three persons, including two Americans, and injuries to an additional 230 other people.  Hundreds of persons received various injuries including blunt force concussions, cuts from shrapnel, burns, and crush injuries from the walls and ceiling which collapsed from the force of the explosives. (Amended Complaint ¶3-4). Several persons were trapped in the rubble until the fire brigade could extinguish the blaze and extricate them.

Lorenzo Alexander Harris was at the discothèque at the time of the attack and suffered permanent breathing abnormalities.  He died four years later as a result of this physical injury.  (Amended Complaint ¶3.  From the time of the attack until before his death, Lorenzo Alexander Harris suffered permanent physical injury and physical suffering and mental anguish and suffering, entitling his estate to compensatory damages.  (Amended Complaint ¶21).  Lorenzo Alexander Harris' death was caused by a willful and deliberate act of extra judicial killing and torture organized planned and facilitated by Defendants

Libya and JSO during the course of their terrorist act of bombing the discotheque.
(Amended Complaint ¶24).

The bombing was carried out at the direction of Colonel Muammar Abu Minar al-
Qadhafi, the de-facto head of the Libyan government, by and through its officials,
employees and agents, Libyan government sponsored terrorist groups and Libyan
government agents of Libyan and German nationality.  (Amended Complaint ¶6-7).  Libya
sponsored the perpetrators, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. §
1605 note, by providing them with funding, planning, direction, and training for their
terrorist activities.  (Amended Complaint ¶6).  Al-Qadhafi provided material support and
resources to those directly involved in the attack through the provision of funding, planning,
direction, and training.  (Amended Complaint ¶6-7).

All of the Defendants participated in a conspiracy to commit the state-sponsored
terrorist bomb attack at the LaBelle Discotheque, and in the execution thereof.  Each of the
Defendants acted through their officials, employees and agents, including the named
individuals.  (Amended Complaint ¶6-7).  The attack itself was carried out by persons
associated with the Libyan secret intelligence service, the Jamahiriya Security Organization
(JSO), including JSO member Musbah Abulgasem Eter.  (Amended Complaint ¶6).
Among the overt acts committed in furtherance of the conspiracy and the execution thereof
were:

In furtherance of this planned attack a Libyan intelligence service courier,
transported sub-machine guns, hand grenades and approximately 12 kg of explosives from
Tripoli to East Berlin as diplomatic luggage.  (Amended Complaint ¶8).

Defendants selected the LaBelle Discotheque in West Berlin, known to be frequented by large numbers of United States military personnel, as the target of the terrorist attack. (Amended Complaint ¶3).

On April 4, 1986, in preparation of the terrorist attack, Souad Chraidi transported approximately 3 kg of plastic explosive loaded with iron parts, a detonator and a delay timing device (timer) from the Libyan embassy in East Berlin to the apartment of Ali and Verena Chanaa in West Berlin. (Amended Complaint ¶8). On April 4, 1986 at around 9:00 p.m. Yasser Chraidi, Ali Chanaa, Verena Chanaa and Eter made the final preparations for the terrorist attack at which time the detonator and timer were fitted into the explosive. (Amended Complaint ¶9). The explosive was concealed in a bag. (Amended Complaint ¶9). After this, Eter said, "This is the answer to the Americans, a gift from Gadhafi to Reagan." (Amended Complaint ¶9).

At around 11:00 p.m. Verena Chanaa and Andrea Häusler brought the bomb to be detonated into the LaBelle Discotheque, where the electrical delay timing device of the explosive was activated. (Amended Complaint ¶10). The bag containing the bomb was placed at a seat in the center of the dance floor. (Amended Complaint ¶10). On April 5, 1986 at around 1:35 a.m. Verena Chanaa and Andrea Häusler left the LaBelle Discotheque. (Amended Complaint ¶10). There were approximately 260 people in the discotheque at the time. (Amended Complaint ¶10).

The bomb exploded with great and destructive force at approximately 1:40 a.m. Three persons--Kenneth Terence Ford, James E. Goins, and Nermin Haney, a female Turkish citizen[1]--were killed. (Amended Complaint ¶11). The explosive pressure tore off Mr. Ford's genitals, and separated his left lower-leg and his left arm from the trunk of his

body.  (Amended Complaint ¶11).  He sustained severe burns on his face and body.  (Amended Complaint ¶11).  He died of shock and loss of blood.  (Amended Complaint ¶11).  Both of Mr. Goins' lower-legs were ripped open and his bones shattered.  (Amended Complaint ¶11).  Metal parts of the bomb penetrated his body and he sustained severe burns on his face and body.  (Amended Complaint ¶11).  Despite an emergency operation, in which both legs were amputated, he later died from his injuries.  Nermin Haney had her left eye torn out and her left lower-leg cut to pieces by the explosion.  She bled to death at the scene.  At least 229 persons suffered severe personal injuries as a result of the bomb explosion.  (Amended Complaint ¶11).

Both before and after the terrorist bomb attack on the LaBelle Discotheque, the telex communications between the Libyan intelligence service switchboard in Tripoli and the Libyan embassy in East Berlin record that the officials, employees and agents of Libya, MFIS, JSO and ESO were responsible for the planning, preparation and execution of this terrorist act.  (Amended Complaint ¶12).  Immediately after this terrorist bomb attack, the Libyan embassy in East Berlin sent a message to the Libyan government stating that the execution of this terrorist act had been carried out successfully.  (Amended Complaint ¶12).  The communication stated that "at 1:30 early this morning the performance of one of the actions took place with success, without leaving behind any clues . . . . "  (Amended Complaint ¶12).

In April 1986 Major General John H. Mitchell was the United States Commander in Berlin.  (Amended Complaint ¶13).  He received secret national defense information from reliable sources.  (Amended Complaint ¶13).  He learned that before the LaBelle bomb attack, instructions had been sent from the Libyan government in Tripoli to the Libyan

---

[1] The estate of Ms. Haney is not a party to this action.  On September 3, 2004, Libya entered into an

People's Office in East Berlin to perform terrorist attacks against Americans and that the Libyan People's Office in East Berlin communicated to the Libyan government in Tripoli immediately after the bomb attack that the operation had been successfully performed. (Amended Complaint ¶13).

On September 10, 1996, Eter visited the German embassy in Malta.  During questioning in the presence of the German ambassador, Eter made a detailed confession by disclosing the planning, preparation and execution of the terrorist attack on La Belle; his own actions; and the actions of the other perpetrators, as set forth above.  (Amended Complaint ¶14).  During further questioning conducted by the senior state prosecutor in Berlin, Eter described in detail the execution of the LaBelle terrorist act by officials, employees and agents of Libya, MFIS, JSO and ESO.  (Amended Complaint ¶14).

On March 17, 2001, al-Qadhafi, in a secret meeting in Tripoli, Libya, admitted to Mr. Steiner, the foreign policy adviser to German Federal Chancellor Schroeder that Libya and he (Al-Ghaddafi) participated in the terrorist bomb attack at the LaBelle Discotheque as well as the "Lockerbie" terrorist act.  (Amended Complaint ¶15).  On March 29, 2001, at a meeting in Washington, D.C. between the leaders of Germany and the United States, Mr. Steiner reported to President George W. Bush, Secretary of State Colin Powell, and National Security Advisor Condoleezza Rice these admissions of al-Qadhafi.  (Amended Complaint ¶15).

## SUMMARY OF ARGUMENT

Libya seeks to escape liability for its bombing of the LaBelle Discotheque by arguing that Section 1083 of the DAA 2008, despite its contrary, explicit language, does not

---

agreement that settled the personal injury and property claims of all European nationals killed, injured, or otherwise damaged by the LaBelle Discotheque bombing.

apply to this case.  The original Complaint in this case was timely brought under 28 U.S.C.

§ 1605(f) and Section 1083 of the DAA 2008, codified at 28 U.S.C. § 1605A and 28 U.S.C.

§ 1605A note, applies to this case.  In any event, Libya waived its right to raise the

affirmative defense of statute of limitations by failing to raise it in its first motion to

dismiss.

Libya also seeks to escape liability by arguing that the state-sponsorship terrorism

exception precludes recovery for victims of large-scale, infamous acts of terrorism such as

the machine gunning of civilians at crowded airports on Christmas Eve or the bombing and

destruction of aircraft such as the Pan Am 103 despite the plain face of the statute, its

legislative history, the wealth of applicable precedent that dictate otherwise, and the

operation of simple logic.

## ARGUMENT

I. **PLAINTIFFS MAY BRING THEIR CASE UNDER THE FOREIGN SOVEREIGN IMMUNITES ACT AS AMENDED BY SECTION 1083 OF THE DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2008**

### A. Section 1083 Of The Defense Authorization Act For Fiscal Year 2008 Explicitly Allows Plaintiffs To File Their Amended Complaint Under 28 U.S.C. § 1605A

Plaintiffs have an explicit right to bring an action under 28 U.S.C. § 1605A.

Section 1083(c)(2)(A) of the newly enacted Defense Authorization Act for Fiscal Year

2008, ("DAA 2008"), Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008), provides

for retroactive application to pending cases, such as this one:

> (2) Prior actions.
>   (A) In general. With respect to any action that--
>     (i) was brought under section 1605(a)(7) of title 28, United States
>   Code, or section 589 of the Foreign Operations, Export Financing, and
>   Related Programs Appropriations Act, 1997 (as contained in section
>   101(c) of division A of Public Law 104-208) [28 USCS § 1605 note],
>   before the date of the enactment of this Act,
>       (ii) relied upon either such provision as creating a cause of action,

(iii) has been adversely affected on the grounds that either or both of
these provisions fail to create a cause of action against the state, and

(iv) as of such date of enactment, is before the courts in any form,
including on appeal or motion under rule 60(b) of the Federal Rules of
Civil Procedure,

that action, and any judgment in the action shall, on motion made by
plaintiffs to the United States district court where the action was initially
brought, or judgment in the action was initially entered, be given effect as
if the action had originally been filed under section 1605A(c) of title 28,
United States Code.

28 U.S.C. § 1605A, note.  Section 1083 of the DAA 2008 should be retroactively applied to

this case, as it was:

  i.    originally brought under 28 U.S.C. § 1605(a)(7) on April 19, 2006, before the date

        of the enactment of the DAA 2008;

  ii.   relied upon "section 589 of the Foreign Operations, Export Financing, and Related

        Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of

        Public Law 104-208) [28 USCS § 1605 note]", also known as the Flatow

        Amendment, to create a cause of action, (Original Complaint ¶23-28);

  iii.  was adversely affected by the Libya's argument that such provision did not create a

        cause of action and the D.C. Circuit's decision that the Flatow Amendment did not

        create such an action.  Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024,

        1033 (D.C. Cir. 2004);

  iv.   and was before this Court on the date of the enactment of the DAA 2008.

Section 1083(c)(2)(B) further provides that a defense of a limitation period is waived:

        (i) in any action with respect to which a motion is made under
        subparagraph (A), or
        (ii) in any action that was originally brought, before the date of the
        enactment of this Act, under section 1605(a)(7) of title 28, United States
        Code, or section 589 of the Foreign Operations, Export Financing, and
        Related Programs Appropriations Act, 1997 (as contained in section
        101(c) of division A of Public Law 104-208) [28 USCS § 1605 note], and
        is refiled under section 1605A(c) of title 28, United States Code,

Section 1083 of the DAA 2008 therefore applies to this case as Plaintiffs filed a motion to refile their complaint under the new law on January 31, 2008, and thereby complied with both sections 1083(c)(2)(B)(i) by making a "motion under subparagraph (A)" and (ii) as this is an action originally brought before the date of the enactment of this act "under section 1605(a)(7) of title 28, United States Code" and refilling under "under section 1605A(c) of title 28, United States Code".

Nowhere in relevant portions of Section 1083 of the DAA 2008 is the issue of timeliness of the original complaint raised as a necessary precondition for the application of the Section 1083 of the DAA 2008 to an existing 28 U.S.C. § 1605(a)(7) action.  Section 1083 of the DAA 2008 does make the timeliness of the existing 28 U.S.C. § 1605(a)(7) action a necessary precondition at Section 1083(c)(3) in a subsection entitled "Related Actions" found in the section entitled "Application to pending cases."  28 U.S.C. § 1605A, note.  Where Congress uses specific language of limitation in one section, but not in another section in the same law, the choice of usage can not be overlooked.  Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 561 (1990) ("Our cases express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment.") (citing Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 837 (1988)); United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 502 (D.C. Cir. 2004) (Roberts, J.) ("The dissent's contrary conclusion -- that subsection (a)(2) does not require any presentment that may be required under subsection (a)(1) -- has tellingly little support.  The dissent's reading of (a)(2) would make the presentment requirement in (a)(1), which the dissent does not challenge head-on, largely meaningless."); National Ass'n of Mfrs. v. United States DOI, 134 F.3d 1095, 1107 (D.C. Cir. 1998) ("As we have repeatedly counseled, such HN27an interpretation, which essentially deprives one provision of its

meaning and effect so that another provision can be read as broadly as its language will permit, is inconsistent with the Congress's intent . . . ."). When Congress drafted Section 1083(c)(2)(A), it did not include the phrase "timely commenced", which was included in Section 1083(c)(3). To read a "timely commenced" requirement into Section 1083(c)(2)(A) would render a portion of Section 1083(c)(3) meaningless.

Congress's intent regarding the statute of limitations provision in the state-sponsorship of terrorism exception to foreign sovereign immunity, codified at 28 U.S.C. § 1605A by Section 1083 of the DAA 2008, is revealed by a floor statement by Senator Frank Lautenberg. Senator Lautenberg was one of the primary sponsors of the bill that became Section 1083 of the DAA 2008. He introduced S.1944, the bill that became Section 1083 of the DAA 2008[2] and described the intent of the bill in a floor statement:

> Another problem is that courts have mistakenly interpreted the statute of limitations provision that Congress created in 1996. In cases such as Vine v. Republic of Iraq and later Buonocore v. Socialist People's Libyan Arab Jamahiriya, the court interpreted the statute to begin to run at the time of the attack, contrary to our intent. It was our intent to provide a 10-year period from the date of enactment of the legislation for all acts that had occurred at anytime prior to its passage in 1996. We also intended to provide a period of 10 years from the time of any attack which might occur after 1996. My provision clarifies this intent.

154 Cong. Rec. S54 (January 22, 2008) (statement of Sen. Lautenberg). This may shed light on why the timeliness requirement was waived for motions filed under Section 1083(c)(2)(A).

In any event, 28 U.S.C. § 1605A(b) further provides for the maintenance of this case under § 1605A:

> (b) Limitations. An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section)

---

[2] The Library of Congress, Thomas website, http://thomas.loc.gov/cgi-bin/bdquery/z?d110:SN01944:@@@P (last visited May 15, 2008).

or section 589 of the Foreign Operations, Export Financing, and Related
Programs Appropriations Act, 1997 (as contained in section 101(c) of
division A of Public Law 104-208) [28 USCS § 1605 note] not later than
the latter of--
   (1) 10 years after April 24, 1996; or
   (2) 10 years after the date on which the cause of action arose.

28 U.S.C. § 1605A(b). Plaintiffs in this case commenced an action under "section

1605(a)(7) (before the date of the enactment of this section)" on April 19, 2006, or within

"10 years after April 24, 1996" and now seek to maintain the case under § 1605A, as

contemplated by the explicit language of Section 1083 of the DAA 2008.

## B. This Case Was Timely Filed Under 28 U.S.C. § 1605(f)

Libya raises an argument regarding the timeliness of Plaintiffs' original complaint.

(Mot. Dismiss at 2-3). Plaintiffs' original complaint was filed within the applicable statute

of limitations for actions brought under section 1605(a)(7):

> No action shall be maintained under subsection (a)(7)
> unless the action is commenced not later than 10 years
> after the date on which the cause of action arose. <u>All
> principles of equitable tolling, including the period during
> which the foreign state was immune from suit, shall apply</u>
> in calculating this limitation period.

28 U.S.C. § 1605(f) (emphasis added). This broadly worded provision favors a liberal

approach to the calculation of statute of limitations for cases brought against state-sponsors

of terrorism in order to effectuate the purpose of the statute. "A 'statute should ordinarily

be read to effectuate its purposes rather than frustrate them.'" <u>United States v. Barnes</u>, 295

F.3d 1354, 1364 (D.C. Cir. 2002) (<u>quoting</u> <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.

Ruckelshaus</u>, 719 F.2d 1159, 1165 (D.C. Cir. 1983)). This is also true of accompanying

equitable tolling provisions. <u>Arce v. Garcia</u> found the applicable statute of limitation is

defined by the statute the case is brought under:

> We look to the relevant statute for guidance in determining whether
> equitable tolling is appropriate in a given situation. "The basic question to be

> answered in determining whether, under a given set of facts, a statute of
> limitations is to be tolled, is one 'of legislative intent whether the right shall
> be enforceable . . . after the prescribed time.'"

Arce, 434 F.3d at 1261 (holding that "[i]n order to determine congressional intent [on the question of equitable tolling], we must examine the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act.") (quoting Burnett v. New York C. R. Co., 380 U.S. 424, 426 (1965)).  The interpretation of § 1605(f) should effectuate its expansive and remedial legislative intent.

Congress passed the "state-sponsored terrorism exception" to the FSIA for the purpose of to deterring and punishing state-sponsored terrorism.  Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 88 (D.C. Cir. 2002); Pub. L. No. 104-132 § 221 (a), (Apr. 24 1996), 110 Stat. 1214.  Congress also sought to create a judicial forum so that the victims of state-sponsored terrorism could seek full compensation.  Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38, 50 (D.D.C. 2000).  The state-sponsored terrorism exception to the FSIA, which was passed for the purposes of deterring state-sponsored terrorism and compensating its victims, requires a more expansive interpretation when a court calculates the applicable statute of limitations.

Defendants' acts that led to the deaths and injuries described in the complaint occurred on April 5, 1986, at a time when the Defendants enjoyed sovereign immunity in United States courts for such acts.  Defendants' sovereign immunity created a complete disability to the filing of a lawsuit by Plaintiffs.  Subsection 1605(f) therefore tolled or halted the operation of the statute of limitations while this disability was in place; the years when Libya was immune from suit must be entirely excluded from the statute of limitations calculation.  "Accordingly, the statute of limitations for the plaintiffs' claims must be tolled

to begin when the defendants were stripped of their immunity with the 1996 enactment of 28 U.S.C. § 1605(a)(7)." Collett v. Socialist People's Libyan Arab Jamahiriya, 362 F. Supp. 2d 230, 242 (D.D.C. 2005); Wyatt v. Syrian Arab Republic, 362 F. Supp. 2d 103, 145 (D.D.C. 2005) (holding that the plaintiffs claims were not time-barred because "[u]nder the terms of § 1605(f), all claims brought under § 1605(a)(7) are tolled up to April 24, 1996, the date of passage of § 1605(a)(7) and the first date that any foreign state's immunity was waived."); Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 60 (D.D.C. 2003) (holding that the plaintiffs' actions were not time-barred because "28 U.S.C. § 1605(f) provides for a statute of limitations of '10 years after the date on which the cause of action arose,' and provides for equitable tolling during the 'period during which the foreign state was immune from suit.' . . . [and] [t]he state of Iran was immune from suit until passage of Pub. L. 104-132 . . . on April 24, 1996.") (quoting 18 U.S.C. § 1605(f)); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 23 (D.D.C. 1998) (ruling that "as a matter of law that the earliest possible date for the statute of limitations to expire for any action brought pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note will be April 24, 2006"). Until the enactment of the subsection of the FSIA that stripped the Defendants of that immunity, which occurred on April 24, 1996, the ten year statute of limitations was not running. The statute halted the running of the ten-year statute of limitations prescribed and allowed Plaintiffs to file this lawsuit at any time until at least April 24, 2006, ten years from the passing by Congress of § 1605(f), instead of ten years from the actual terrorist attack.

Relying on the settled precedent in this Circuit, this suit was filed on April 19, 2006, within ten years from April 24, 1996, the date Congress passed the subsection of the FSIA that stripped the Defendants of their immunity. Accordingly, the Plaintiffs' Complaint was timely filed and is not time barred.

Two contrary decisions in this circuit, <u>Vine v. Republic of Iraq</u>, 459 F. Supp. 2d 10,

24 (D.D.C. 2006) and <u>Buonocore v. Socialist People's Libyan Arab Jamahiriya</u>, No. 06-727

(GK), 2007 LEXIS 49031 at *5-10 (D.D.C. 2007), interpreted 28 U.S.C. § 1605(f) in a way

that would result in the dismissal of this case. <u>Vine</u> and <u>Buonocore</u> interpreted the ten year

period in 28 U.S.C. § 1605(f) to begin running on the date of the terrorist attack. 459 F.

Supp. 2d at 24; 2007 LEXIS 49031 at *9. <u>Vine</u> and <u>Buonocore</u> concluded that the equitable

tolling principles codified in 28 U.S.C. § 1605(f) operated to only allow victims a

"reasonable time" after the expiration of the ten year period. 459 F. Supp. 2d at 24, 2007

LEXIS 49031 at *10. These decisions were expressly repudiated in a floor statement by

Senator Frank Lautenberg, one of the primary sponsors of original sponsors of the state-

sponsor of terrorism exception and the bill that became Section 1083 of the DAA 2008. He

introduced S.1944, the bill that became Section 1083 of the DA and described the intent of

the bill in a floor statement:

> Another problem is that courts have mistakenly interpreted the statute of
> limitations provision that Congress created in 1996. In cases such as Vine
> v. Republic of Iraq and later Buonocore v. Socialist People's Libyan Arab
> Jamahiriya, the court interpreted the statute to begin to run at the time of
> the attack, contrary to our intent. It was our intent to provide a 10-year
> period from the date of enactment of the legislation for all acts that had
> occurred at anytime prior to its passage in 1996. We also intended to
> provide a period of 10 years from the time of any attack which might
> occur after 1996. My provision clarifies this intent.

154 Cong. Rec. S54 (January 22, 2008) (statement of Sen. Lautenberg). There can be no

clearer repudiation of <u>Vine</u> and <u>Buonocore</u> and expression of Congressional intent in

support of the operation of 28 U.S.C. § 1605(f) as described by <u>Collett</u>, <u>Wyatt</u>, <u>Peterson</u>,

and <u>Flatow</u>.

If this Court adopts the <u>Vine</u> and <u>Buonocore</u> interpretation of 28 U.S.C. § 1605(f),

which is explicitly repudiated in a floor statement to the DAA 2008 by the original

cosponsor of the state-sponsor of terrorism exception, rather than the Collett, Wyatt, Peterson, and Flatow interpretation, the ten year limitations period would have began to run on the date of the bombing, April 6, 1985, and therefore expired on April 6, 1995. Under the equitable tolling principles codified in 28 U.S.C. § 1605(f), Plaintiffs would have a "reasonable time" after April 6, 1995 expiration date to file their lawsuit. As Libya retained sovereign immunity until the passage of the state-sponsored terrorism exception 28 U.S.C. § 1605(a)(7) on April 24, 1996, presumably the Plaintiffs would have had a short period within which to file after April 24, 1996. If this Court adopts the Collett, Wyatt, Peterson, and Flatow interpretation of 28 U.S.C. § 1605(f), which is explicitly advocated in a floor statement to the DAA 2008 by the original cosponsor of the state-sponsor of terrorism exception, rather than the Vine and Buonocore interpretation, the ten year limitations period would have began to run on the date that Congress passed a law that created an exception to Libya' sovereign immunity for cats such as the LaBelle Discothèque bombing.

The incorrect interpretation of 28 U.S.C. § 1605(f) found in Vine and Buonocore springs from a mistaken reliance on Phillips v. Heine, 984 F.2d 489 (D.C. Cir. 1993). Phillips ruled that when a disability to suit is lifted, a plaintiff may have a "reasonable period after the tolling circumstance mended" to file; meaning a plaintiff may have must immediately file if the ten year period had passed unless there are further obstacles that are judicially cognizable under equitable tolling principles. 984 F.2d at 492. In support of the "reasonable time" test, Phillips cites Cada v. Baxter Healthcare Corp., 920 F.2d 446, 452 (7th Cir. 1990), a single case to support the Phillips "reasonable time" test. 984 F.2d at 492. Cada does not cite a single case, treatise or law review in support of its interpretation of equitable tolling principles. 920 F.2d 446. The isolation of Cada's interpretation, and therefore Phillips, is spelled out by Socop-Gonzalez v. INS, 272 F.3d 1176, 1195 (9th Cir.

Cal. 2001). <u>Socop-Gonzalez v. INS</u> explicitly rejected <u>Cada:</u> "We believe, and the following discussion will demonstrate, that this approach to tolling is needlessly difficult to administer, runs counter to Supreme Court precedent, and undermines the policy objectives of the statutes of limitations." <u>Id.</u> <u>Socop-Gonzalez v. INS</u> found <u>Cada</u> contrary to the Supreme Court decision in <u>Burnett v. New York C. R. Co.</u>, 380 U.S. 424, 435-36 (1965) which "explicitly rejected" an approach that allowed a "reasonable time" after the disability to the filing of a lawsuit had been lifted, rather than tolling the operation of the statute of limitations while the disability to the filing existed.

The inapplicability of <u>Phillips</u> to cases brought under 28 U.S.C. § 1605(a)(7) also derives from the limitations provision at issue in <u>Phillips.</u> As noted above, a statute of limitations must be interpreted in accordance with the statute's congressional intent. The <u>Phillips</u> decision, drawn from the conservative Death on the High Seas Act ("DOHSA") legislative scheme, is not a useful guide to 28 U.S.C. § 1605(f). "The legislative history of the Death on the High Seas Act discloses a clear congressional purpose to leave 'unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States.'" <u>Gillespie v. United States Steel Corp.</u>, 379 U.S. 148, 165 (1964) (citation omitted). The DOHSA was intended to maintain the status quo by leaving existing state remedies in place and creating a federal remedy only where there was not coverage by already-existing remedies. <u>Moragne v. States Marine Lines</u>, 398 U.S. 375, 398 (1970). The existing state remedies were usually more generous than the new and less-substantial federal right created under the DOHSA. <u>In re Air Crash off Long Island</u>, 209 F.3d 200, 209 (2d Cir. 2000). The conservative nature of the DOHSA's provisions and its equally conservative Congressional purpose stand in sharp contrast to the explicit and

expansive wording of the state-sponsorship of terrorism exception's tolling provision and its broad, remedial, legislative purpose.

Decisions that analyze equitable tolling principles under the Torture Victim Protection Act's[3] statute of limitations may be instructive to the Court because the TVPA and the FSIA are similar in purpose and legislative intent. Arce, 434 F.3d at 1261-62 (noting that the TVPA was enacted to address serious violations of international human rights abroad). Both the TVPA and the state-sponsorship of terrorism exception have broad, remedial purposes. Such remedial statutes must be broadly construed, consistent with their plain meaning. Reyton v. Rowe, 391 U.S. 54 (1968). Courts deciding the application of equitable tolling to TVPA cases, like the courts that have decided equitable tolling in FSIA cases, have excluded periods of immunity from the statute of limitations calculation. Arce, 434 F.3d at 1264; Jean v. Dorelien, 431 F.3d 776, 780 (11th Cir. 2005) (approving the Collett court's interpretation of § 1605(f) that found "the statute of limitations for the plaintiffs' claims must be tolled to begin when the defendants were stripped of their immunity."); Hilao v. Estate of Marcos, 103 F.3d 767, 773 (9th Cir. 1996). The Court should do the same here.

### C. Defendant Failed To Raise The Statute Of Limitations Defense, Which Is An Affirmative Defense

Defendant also argues that Plaintiffs can not now seek retroactive application of Section 1083 of the DAA 2008 to this case as the case was not originally brought under 28 U.S.C. § 1605(a)(7) in a timely manner. (Mot. Dismiss at 1-4). A statute of limitations defense however is an affirmative defense, Fed. R. Civ. P. 8(c), and is waived unless raised by the defendant. Colbert v. Potter, 471 F.3d 158, 167 (D.C. Cir. 2006) (citations omitted)

(finding "[t]he filing time limit imposed by Title VII, 42 U.S.C. § 2000e-16(c), 'is not a jurisdictional requirement but rather is similar to a statute of limitations.'").  This remains true for cases brought under 28 U.S.C. § 1605(a)(7).  Rux v. Republic of Sudan, 2005 U.S. Dist. LEXIS 36575 at *82 (E.D. Va. August 26, 2005)[4] ("The statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)."); see Morris v. People's Republic of China, 478 F. Supp. 2d 561, 566 (S.D.N.Y. 2007) (a court ruling on a statute of limitations defense in FSIA case found "[w]here the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss[, which] is properly treated as a Rule 12(b)(6) motion to dismiss.").  The statute of limitations is an affirmative defense rather than a jurisdictional one.  Libya did not raise this defense in its motion to dismiss the case brought under 28 U.S.C. § 1605(a)(7) and so has waived the defense.

Libya cites John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 753 (2008) for the proposition that the limitations defense offered by 28 U.S.C. § 1605(f) is jurisdictional in nature and can not be waived by a defendant.  (Mot. Dismiss at 3-4).  The John R. Sand decision however only found that the specific statute of limitations provision under review, 28 U.S.C. § 2501,[5] is a jurisdictional provision.  Id.

> The question presented is whether a court must raise on its own the timeliness of a lawsuit filed in the Court of Federal Claims, despite the Government's waiver of the issue. We hold that the special statute of limitations governing the Court of Federal Claims requires that sua sponte consideration.

---

[3] 28 U.S.C. § 1350.  The TVPA was instructive to the drafters of the state-sponsor terrorism exception to sovereign immunity, 28 U.S.C. § 1605(a)(7) and now 28 U.S.C. § 1605A, who relied upon the TVPA for the definition of "extrajudicial killing", "torture" and "hostage-taking."

[4] The Rux case was vigorously defended by counsel representing the defendants in that case, through an appeal to the Supreme Court.  Republic of Sudan v. Rux, 127 S. Ct. 1325 (2007).

[5] "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.  The language of this provision could not be more different than 28 U.S.C. § 1605(f), which contains an explicit equitable tolling provision.

Id. at 752 (emphasis added); see Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96 (U.S. 1990) (finding that the waiver of U.S. sovereign immunity found in Title VII, and codified at 42 U. S. C. § 2000e-16 (c), was not jurisdictional and allowed for the application of equitable tolling by a court). The John R. Sand ruling does not apply to the limitations provision at issue in this case, which was a procedural limitations provision and not a jurisdictional provision. The Court in John R. Sand reached its conclusion by drawing a distinction between statute of limitations provisions that were affirmative defenses, requiring a defendant to raise the defense or waive it, and limitations provisions that were jurisdictional in nature, requiring a court to raise the defense even if a defendant did not. 128 S. Ct. at 753. The jurisdictional limitation on foreign state sovereignty is found in 28 U.S.C. § 1605(a)(7), not 28 U.S.C. § 1605(f). "A clause that supplies a statutory time limit is not itself a waiver of sovereign immunity; it is rather a condition subsequent that the Congress may place upon the waiver." Brown v. Secretary of the Army, 86 F.3d 225, 227 (D.C. Cir. 1996). 28 U.S.C. § 1605(f) was a "condition subsequent" to the waiver of sovereign immunity found at 28 U.S.C. § 1605(a)(7) and was not a jurisdictional provision.

The Court in John R. Sand primarily based its decision on its longstanding precedent on the issue: for over a century the Court has consistently read 28 U.S.C. § 2501 to be a jurisdictional statute. 128 S. Ct. at 754 (citations omitted) ("Over the years, the Court has reiterated in various contexts this or similar views about the more absolute nature of [28 U.S.C. § 2501] the court of claims limitations statute."). At least one federal court of appeals has held that the holding of John R. Sand is restricted to 28 U.S.C. § 2501, the limitations provision that was before the Court in that case:

> The Court there noted that most limitations periods are non-jurisdictional affirmative defenses and are subject to equitable tolling, see id. at   , 169

> L. Ed.2d 591, 2008 WL at *3, and viewed the limitations period governing
> suits against the United States in the Court of Federal Claims as
> jurisdictional only because a long line of prior decisions had so held and
> were entitled to adherence under principles of stare decisis, see id. at   ,
> 169 L. Ed.2d 591, 2008 WL at *6.

Diaz v. Kelly, 515 F.3d 149, 153-154 (2d Cir. 2008) (emphasis added).  28 U.S.C. §

1605(f) however has never been interpreted to be a jurisdictional provision and § 1605(f)'s

particular construction, which subjects it to equitable tolling, further distinguishes this case

from John R. Sand.

    The John R. Sand decision also noted that a jurisdictional limitations provision

forbids a court from considering "whether certain equitable considerations warrant

extending a limitations period."  128 S. Ct. at 753 (citing Bowles v. Russell, 127 S. Ct.

2360, 168 L. Ed. 2d 96, 103 (2007)).  The Court also noted that procedural limitations

provisions, which can be waived by defendant, "typically permit courts to toll the

limitations period in light of special equitable considerations."  128 S. Ct. at 753 (citations

omitted).  The Court in John R. Sand would have ruled differently if 28 U.S.C. § 2501 had

contained an equitable tolling provision.  Id.  In stark contrast to limitations provision the

Court found to be jurisdictional in John R. Sand, 28 U.S.C. § 1605(f) was written with an

explicit provision for equitable tolling:

> All principles of equitable tolling, including the period
> during which the foreign state was immune from suit,
> shall apply in calculating this limitation period.

28 U.S.C. § 1605(f).  An equitable tolling provision allows complaints to be filed outside

the specified time limit, which means the limitations provision can not qualify as a

jurisdictional provision.  See Colbert v. Potter, 471 F.3d 158, 167 (D.C. Cir. 2006)

(recognizing that Title VII's jurisdictional statutes do not limit jurisdiction to timely filed

complaints ) (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)).  This

further supports Plaintiffs' argument that 28 U.S.C. § 1605(f) is a procedural limitations provision, which can be waived if not affirmatively raised.

Finally, a waiver of U.S. sovereign immunity and a waiver of foreign sovereign immunity must be analyzed differently due to the vastly different policy considerations at play. A court must consider the "the special governmental interest in protecting public funds" when it construes limitations provisions for waivers of U.S. sovereign immunity. John R. Sand, at 756. The policy goal that motivated Congress when it created 28 U.S.C. § 1605(a)(7) was quite different. "In enacting this provision [28 U.S.C. § 1605(a)(7)], Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." (Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir. 2002) (citing Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38, 50 (D.D.C. 2000)). Libya therefore waived its limitations defense in 28 U.S.C. § 1605(f) and section 1083 of the DAA 2008 clearly applies, allowing its retroactive effect to this lawsuit.

## II.    LIBYA'S PECULIAR INTERPRETATION OF THE TERM "EXTRA-JUDICIAL KILLING" DEFIES LOGIC, THE EXPLICIT LANGAUGE OF THE STATUTE AND ITS LEGISLATIVE HISTORY

Libya also seeks to escape liability for its bombing of the LaBelle Discotheque by arguing that the phrase "extra-judicial killing" as used in 28 U.S.C. § 1605A(a)(1) does not include terrorist attacks carried out against "groups of people." (Mot. Dismiss at 4). Libya's argument notwithstanding, it can not seriously dispute that its bombing of the LaBelle Discotheque, which resulted in 3 deaths and hundreds of horrible injuries, constituted an act of "extrajudicial killing" within the meaning of the statute. If terrorists blow up a discothèque packed with of innocent civilians, this is on its face an extrajudicial killing. Any other interpretation under a statute designed to deter the state-sponsorship of

terrorism would be quite extraordinary.  Unfortunately, for acts not with solitary, summary

executions.  Libya's peculiar interpretation would conveniently exempt all of its acts of

large scale terrorism from litigation and penalize only small scale acts of terrorism and lead

to an absurd and amoral result.  Minor acts of terrorism, which don't require state-

sponsorship would be exposed to litigation while the large scale acts of terrorism for which

Libya gained infamy such as terrorist machine-gun shooting attacks at crowded airports on

Christmas Eve or the murder of hundreds by the bombing of Pan Am Flight 103 and UTA

Flight 177 while in flight, would not be exposed to litigation.

   Libya can not point to any such distinction in the statute itself; rather it refers to the

legislative history for a bill that was not passed.  (Mot. Dismiss at 4-5).  28 U.S.C. §

1605A(h)(7) defines extra-judicial killing with the same meaning as found in the Torture

Victims Protection Act ("TVPA"), 28 U.S.C. § 1350:

> Extrajudicial killing. For the purposes of this Act, the term 'extrajudicial
> killing' means a deliberated killing not authorized by a previous judgment
> pronounced by a regularly constituted court affording all the judicial
> guarantees which are recognized as indispensable by civilized peoples.
> Such term, however, does not include any such killing that, under
> international law, is lawfully carried out under the authority of a foreign
> nation.

This definition also lacks Libya's distinction regarding the size of group of people targeted

for a "deliberated killing not authorized by a previous judgment pronounced by a regularly

constituted court".  Furthermore, such an arbitrary distinction, which finds no support in the

language of any statute, would undermine the legislative intent of Congress when it passed

the original state-sponsorship of terrorism exception.

   The legislative history of Section 1083 of the DAA 2008, which created 28 U.S.C. §

1605A, is more instructive on this point than the legislative history of a bill from 1994 that

was not passed, which Libya cites repeatedly.  The purpose of 28 U.S.C. § 1605(a)(7) is

straightforward.  "In enacting this provision [28 U.S.C. § 1605(a)(7)], Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future."  (Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir. 2002) (citing Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38, 50 (D.D.C. 2000)).  The same intent serves as the foundation Section 1083 of the DAA 2008.  Senator Frank Lautenberg introduced S.1944, the bill that became Section 1083 of the DAA.  He described the intent of the bill in a floor statement:  "I believe this legislation is essential to providing justice to those who have suffered at the hands of terrorists and is an important tool designed to deter future state-sponsored terrorism."  154 Cong. Rec. S54 (January 22, 2008) (statement of Sen. Lautenberg).  In Senator Lautenberg's floor statement, he explicitly singled out the case Peterson v. Islamic Republic of Iran, CA 01-2094 (RCL) (D.D.C. filed October 3, 2001) as the "inspiration for this new legislation."  Id. at S55.

Peterson v. Islamic Republic of Iran is an action arising from the October 23, 1983, bombing of a United States Marine barracks in Beirut, Lebanon, in which 241 American servicemen" were murdered, brought by nearly one thousand plaintiffs" including "many of the family members and estates of the 241 servicemen killed in the attack."  515 F. Supp. 2d 25, 36-37 (D.D.C. 2007).  This act of terrorism is precisely the type of terrorism that Libya's interpretation of "extrajudicial killing" would immunize.  The Peterson court found the actions of the terrorists who killed the 241 servicemen to be an "extra-judicial killing." Id. at 61.  Senator Lautenberg went on to note the new legislation would now empower the victims of this terrorist attack "to pursue Iranian assets to obtain this just compensation for their suffering."  154 Cong. Rec. S55.  Massive torts cases resulting from indiscriminate

bombing of civilian populations therefore were the exact sort of case the drafters of section 1083 of the DAA 2008 had in mind when they created the law.

In analyzing whether conduct constitutes an "extrajudicial killing" and warrants the lifting of sovereign immunity, courts look to the attack as a whole rather than its impact on each individual plaintiff and his or her resulting injuries. See e.g., Pugh v. Socialist People's Libyan Arab Jamahiriya, 2006 WL 2384915 at * 9 (D.D.C. 2006) (finding that the bombing of UTA Flight 772 was an extrajudicial killing that removed Libya's sovereign immunity under the FSIA, thus permitting the estates of the Americans killed and their families to proceed with their causes of action). The provision of support for a bombing of civilians constitutes an extra-judicial killing or a ""deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court". E.g., Sisso v. Islamic Republic of Iran, 2007 U.S. Dist. LEXIS 48627 at *18-19 (D.D.C. July 5, 2007) ("Furthermore, the facts demonstrate that plaintiff's injury was caused by the provision by Iran and MOIS of material support or resources for an act of extrajudicial killing. The September 19 bombing qualifies as an act of extrajudicial killing."); Rux v. Republic of Sudan, 495 F. Supp. 2d 541, 555 (E.D. Va. 2007) (finding "[t]he deliberate murder of the seventeen American sailors" by a suicide bomber "qualifies as an 'extrajudicial killing.'"). The state-sponsored terrorism exception explicitly provides subject matter jurisdiction for US national claims for " . . . personal injury or death that was caused by an act of torture, extrajudicial killing. . . ." 28 U.S.C. § 1605(a)(7) (emphasis added). It is irrelevant, therefore, whether everyone in the crowd is killed or some are merely injured, so long as the Plaintiffs' injuries were "caused by" the extrajudicial killing.

In this case Libya provided material support to terrorists for the purpose of carrying terrorist attacks against U.S. targets in East Berlin. "In furtherance of this planned attack a

Libyan intelligence service courier, transported sub-machine guns, hand grenades and approximately 12 kg of explosives from Tripoli to East Berlin as diplomatic luggage." (Amended Complaint ¶8). These weapons are hardly the sort used to support the "summary execution" of a single person. Libya provided 12 kg of explosives to the terrorists on its payroll so that they could make bombs to kill Americans. To this end, a bomb was placed in a packed discothèque, and the explosive force killed three persons. (Amended Complaint ¶11). This constitutes an extra-judicial killing.

III.    **PLAINTIFFS' ALLEGATIONS IN THIS CASE SATISFY THE REQUIREMENTS OF 28 U.S.C. § 1605A AND ALLOW THE COURT TO ASSERT SUBJECT MATTER JURISDICTION**

Libya argues that 28 U.S.C. § 1605A "does not create an exception to foreign sovereign immunity for the secondary claims of indirect victims of terrorist acts . . .", (Mot. Dismiss at 6), and that the phrase "personal injury" as used in section 1605A(a), which allows subject matter jurisdiction for claims for "personal injury or death", does not include claims for emotional injuries by family members. (Mot. Dismiss at 5-9). Libya is unable to cite a single case that supports its contention that the phrase "personal injury" does not include emotional injuries or secondary claims of indirect victims. (Mot. Dismiss at 6).[6] Rather than look to the text of 28 U.S.C. § 1605A, Libya then directs the Court's attention to the legislative history of a precursor bill from 1994 for a different law. (Mot. Dismiss at 7). Little light can be shed on what Congress meant when it wrote the DAA 2008 in 2008 by referring to the legislative history of a bill from 1994 that was never passed.

---

[6] Libya cites Kalil v. Johanns, 407 F. Supp. 2d 94, 100 (D.D.C. 2005), in support of the proposition that there is a circuit split as to whether the phrase "injury or death" from the Federal Employees' Compensation Act includes nonphysical injuries. The policy goals of the Federal Employees' Compensation Act could hardly be similar to the policy goals behind an act to deter state-sponsored terrorism and the Court should interpret the statutory language accordingly.

Illumination can be created by consulting both the explicit language of the statute itself and

the legislative history of the new statute, rather than the bill from 1994.

28 U.S.C. § 1605A provides an explicit cause of action for the emotional damages

of family members. "The first (and most basic) step on any interpretive path is the

language of the statute itself." United States v. McGoff, 831 F.2d 1071, 1078 (D.C. Cir.

1987). A statute is to be read as a whole, see e.g., Alaska Dep't of Envtl. Conservation v.

EPA, 540 U.S. 461, 489 (2004), and the explicit wording of 28 U.S.C. § 1605A(c)

conclusively rebuts Libya's argument that only physically injured victims of state-

sponsored terrorism may pursue claims against sovereign defendants under 28 U.S.C. §

1605A. Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 561 (1990) ("Our cases

express a deep reluctance to interpret a statutory provision so as to render superfluous other

provisions in the same enactment."). 28 U.S.C. § 1605A(c), the private right of action

contained within 28 U.S.C. § 1605A, explicitly states that a foreign state . . . . shall be liable

. . . .for personal injury or death . . . .   In any such action, damages may include economic

damages, solatium, pain and suffering, and punitive damages." (emphasis added). 28

U.S.C. § 1605A therefore contains a cause of action that explicitly lists emotional damages

by family members as one of the damage components available under the new law.

Solatium is a damage claim for emotional injuries belonging to a family member of a victim

of an act of terrorism. E.g., Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 29 (D.D.C.

1998) ("Solatium is traditionally a compensatory damage which belongs to the individual

heir personally for injury to the feelings and loss of decedent's comfort and society.");

Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 (D.D.C. 2005).

Senator Frank Lautenberg's floor statement read upon the passage of Section 1083

of the DA described the intent of the bill. "I believe this legislation is essential to providing

justice to those who have suffered at the hands of terrorists and is an important tool

designed to deter future state-sponsored terrorism."  154 Cong. Rec. S54 (January 22, 2008)

(statement of Sen. Lautenberg).  Senator Lautenberg explicitly singled out the case Peterson

v. Islamic Republic of Iran, CA 01-2094 (RCL) (D.D.C. filed October 3, 2001) as the

"inspiration for this new legislation."  Id. at S55.  Peterson v. Islamic Republic of Iran is an

action arising from the October 23, 1983, bombing of a United States Marine barracks in

Beirut, Lebanon, in which 241 American servicemen" were murdered, brought by nearly

one thousand plaintiffs" including "many of the family members and estates of the 241

servicemen killed in the attack."  515 F. Supp. 2d 25, 36-37 (D.D.C. 2007).  The Peterson

court recognized family members as suffering a "personal injury" and awarded damages to

compensate them for their emotional suffering.  Id. at 37.  Senator Lautenberg's Floor

Statement went on to note the new legislation would now empower the victims of this

terrorist attack "to pursue Iranian assets to obtain this just compensation for their suffering."

154 Cong. Rec. S55.  Compensation for family members in massive torts cases resulting

from indiscriminate bombing of civilian populations therefore was in the minds of the

drafters of section 1083 of the DAA 2008 when they created the law.

Libya cites to Puleo v. Islamic Republic of Iran, (Mot. Dismiss at 8) to support its

argument, although this decision admits solatium damages were available for family

members of terrorism victims under 28 U.S.C. § 1605(a)(7).  2002 U.S. Dist. LEXIS 27050

at *7 (D.D.C. June 21, 2002) (aff'd on other grounds 353 F.3d 1024 (D.C. Cir. 2004)).

There are many decisions from this circuit that found emotional damages were available to

family members of victims under 28 U.S.C. § 1605(a)(7).  Estate of Heiser v. Islamic

Republic of Iran, 466 F. Supp. 2d 229, 305 (D.D.C. 2006); Dammarell v. Islamic Republic

of Iran, 404 F. Supp. 2d 261, 283 (D.D.C. 2005); Salazar v. Islamic Republic of Iran, 370 F.

Supp. 2d 105, 115 (D.D.C. 2005).  These cases include cases against Libya where the defendant mounted a skilled and vigorous defense.  E.g., Pugh v. Socialist People's Libyan Arab Jamahiriya, 530 F. Supp. 2d 216, 262 (D.D.C. 2008) (awarding family members damages for "intentional infliction of emotional distress" claims under the FSIA).  28 U.S.C. § 1605A therefore allows family members to bring claims for their emotional damages.

## CONCLUSION

For the foregoing reasons, the Court should deny Libya's Motion to Dismiss. Plaintiffs respectfully request a hearing on this motion.


Dated:  May 16, 2008                    Respectfully submitted,


                                        **/s/ Steven R. Perles**
                                        Steven R. Perles
                                        Perles Law Firm, PC
                                        1146 19th Street, NW, Fifth Floor
                                        Washington, DC  20036
                                        Telephone:  202-955-9055
                                        Telefax:  202-955-3806

                                        Counsel for Plaintiffs